**UNITED STATES of America, Plaintiff,**

v.

**Delmer Dee GRANT and Jerrel Grant, Defendants.**

**Cr. No. 92–20217–TUBRO.**

United States District Court,
W.D. Tennessee, W.D.

March 18, 1993.

Joseph C. Murphy, Jr., Asst. U.S. Atty., Memphis, TN, for plaintiff.

Carl I. Jacobson and Clifton Harviel, Asst. Federal Defender, Memphis, TN, for defendants.

### ORDER ON OBJECTIONS TO MAGISTRATE'S REPORT ON MOTIONS TO SUPPRESS

TURNER, District Judge.

Defendants are charged with aiding and abetting each other in possessing with the intent to distribute approximately 100 pounds of marijuana and approximately 33 grams of methamphetamine in violation of 21 U.S.C. § 841(a)(1), and with carrying a firearm during and in relation to a drug-trafficking crime in violation of 18 U.S.C. § 924(c). This matter was referred to the magistrate judge for a ruling on the defendants' motions to suppress tangible evidence and statements. A hearing was conducted at which the magistrate judge heard testimony from officers of the Memphis Police Department involved in the search and subsequent arrest. Thereafter, the magistrate judge issued a report recommending that Delmer Dee Grant's motion to suppress the tangible evidence obtained during the search of the car be granted, that the statements of Delmer and Jerrel Grant made at the scene and at the station house following their arrest be suppressed as fruit of the illegal seizure, and that the motion of Jerrel Grant to suppress the tangible evidence obtained during the search of the car be denied.

### I. Facts

On June 23, 1992, Officer Felix Calvi of the Memphis Police Department was on routine patrol on Interstate 240 in Memphis, Shelby County, Tennessee. Defendants were travelling eastbound in the far right lane on I–240 in a 1983 Lincoln with Texas license plates. Delmer Dee Grant was driving and Jerrel Grant was riding in the front passenger seat.

Officer Calvi testified that he stopped defendants' car after he observed the left tires

of the car "straddling the lanes" for approximately thirty feet. On later questioning by the magistrate judge, however, Officer Calvi admitted that the Grant vehicle's left tires never left contact with the divided white line separating the traffic lanes. Officer Calvi testified that he believed this constituted a violation of Memphis Code § 21–99.1 which provides that "[a] vehicle shall be driven entirely within a single lane and shall not be moved from such lane until the driver has ascertained that such movement can be made with safety." Officer Calvi admitted that traffic at the time was light and that the movement of the Grant vehicle did not cause any cars to swerve. In fact, there were no cars travelling in the lane to the left of the Grant vehicle at the time its left tires came into contact with the divided white line.[1]

After stopping defendants' car by use of his flashing blue lights, bright lights, and siren, Officer Calvi used a loudspeaker to order Delmer Dee Grant to get out of the car and come back to the police cruiser. Officer Calvi placed Delmer in the back seat of the squad car. Officer Calvi testified that there are no door handles on the inside of the back doors of the squad car and that the front and back seats are separated by a cage. When Delmer was enclosed in the back seat of the squad car, he was locked in and could not get out without being let out from the outside.

Officer Calvi advised Delmer that he had been pulled over for straddling the lanes and would be issued a courtesy warning. While issuing the courtesy warning, Officer Calvi engaged Delmer in conversation about where

the defendants were going and the purpose of their trip. After completing the courtesy citation, Officer Calvi returned Delmer Grant's drivers license and gave him a copy of the courtesy citation. Although Officer Calvi acknowledged that he had completed the traffic stop at that point, he did not let Delmer out of the car or advise him that he was free to go. Instead, since his suspicions were aroused because Delmer seemed "overly nervous," Officer Calvi asked Delmer if he could talk to the passenger. Delmer agreed. According to Officer Calvi, he left Delmer in the back seat "because I didn't want him roaming around. He was more safe in the back seat than being outside in my opinion." Although Officer Calvi testified that Delmer was free to go at this time, he acknowledged that Delmer could not have exited the car unless Calvi opened it for him from the outside.

Leaving Delmer locked in the back seat of the squad car, Officer Calvi approached the Grant car on the passenger side to question the passenger, Jerrel Grant. Jerrel gave responses to Officer Calvi's questions which were inconsistent with those just given by Delmer. In addition, Officer Calvi testified that while talking with Jerrel he smelled a light odor of marijuana through the open window of the car.

The order of the events which followed is unclear, but at some point Officer Tate pulled up to assist with the stop, the officers obtained Delmer's signature on a written consent to search form, called for a drug dog, and searched the vehicle.[2] At the time the

---

1. According to Officer Calvi, defendants were travelling the speed limit of fifty-five miles per hour. Officer Calvi did not observe any other traffic violations.

2. During direct examination, Officer Calvi initially appeared confused about whether he obtained consent from Delmer to search the car before or after calling for a drug dog to be brought to the scene. He then testified that he definitely obtained consent prior to calling for the drug dog.

   Officer Tate testified that he arrived on the scene while Officer Calvi was talking to Jerrel on the passenger side of the Grant car. Officer Tate testified that he stood at the passenger window with Officer Calvi where he also smelled marijuana. According to Officer Tate's initial testimony, Officer Calvi then called for a drug dog while Officer Tate remained talking to Jerrel. Jerrel then got out of the car and he and Officer

Tate walked toward Officer Calvi's squad car. Officer Tate initially said that by that time Officer Miller had arrived with the drug dog. He stated that while Officer Miller talked with Jerrel, Officer Tate got into Officer Calvi's car and only then witnessed Officer Calvi explain to Delmer the voluntary nature of the consent form and obtain Delmer's signature on it. According to Officer Tate's version, Jerrel was then put into the back seat of his squad car. On later questioning by the government, Officer Tate appeared to revise his testimony and stated that the consent to search form was signed before the drug dog arrived.

   Officer Calvi's report indicates that Delmer's consent to search was obtained prior to calling for the drug dog, but indicates that Officer Tate did not arrive on the scene until after consent was obtained and the drug dog had arrived. Officer Tate did not sign the witness space on the

officers obtained Delmer's signature on the consent to search form, Delmer was still locked in the back of the squad car. Officer Calvi testified that he told Delmer, "If you don't have anything illegal in the vehicle, you can sign the form, but you don't have to. It's a voluntary type thing." Delmer signed the form. The officers also asked Jerrel whether he would sign a consent to search form, but he refused.

Officer Jim Miller arrived with a narcotics dog, who subsequently "alerted" to the trunk of the car. By this time, Jerrel Grant was secured in the back seat of Officer Tate's squad car. The officers conducted a search of the car and found marijuana, methamphetamine, and two guns. Following the search of the car, Officer Calvi read Delmer and Jerrel their rights under *Miranda*[3] and placed them under arrest. Officer Calvi testified that Delmer admitted owning one of the guns found in the car and Jerrel admitted owning the other.

Thereafter, Delmer and Jerrel were transported to the office of the Organized Crime Unit ("OCU"). Some three to four hours later,[4] each signed a written statement concerning the incident. Each was again advised of his *Miranda* rights prior to giving a statement. Neither Delmer nor Jerrel consulted with a lawyer between the time of the arrest and the time he gave a statement, and neither was ever outside the presence of OCU officers prior to giving his statement.

Following the hearing, the magistrate judge concluded that there was "no legal justification to stop the defendants' vehicle" for touching the divided white line for less than one half of one second[5] where there was no traffic in the lane to its left. In the view of the magistrate judge, Delmer's consent to search the vehicle, the evidence found during the search, and the statements of both defendants flowed from the illegal stop

of the vehicle and must be suppressed as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The magistrate judge further found that a reasonable person locked in the back of a squad car would not have believed that he was free to go. Accordingly, since there was no justification for continuing to hold defendants following the issuance of the courtesy citation, doing so constituted an additional illegal detention. The magistrate judge concluded, however, that "although he was illegally stopped on the highway and detained, just as Delmer Grant was, Jerrel Grant cannot, under Sixth Circuit law, challenge the search of the vehicle because he has shown no standing to do so." Accordingly, the magistrate judge recommended that Jerrel's motion challenging the tangible evidence obtained during the search of the car be denied.

The government timely filed objections to the magistrate judge's report and recommendation. The government does not object to the magistrate judge's conclusion that the initial stop of the vehicle and the detention of Delmer Grant after the courtesy citation was issued were illegal. The court thus adopts the magistrate judge's conclusions with respect to the illegality of the initial stop of the Grant vehicle and the continued detention after the courtesy citation was issued. The government likewise does not challenge the magistrate judge's recommendation that the tangible evidence resulting from the search of the vehicle be suppressed as fruit of the illegal seizure, but argues that the statements the defendants made at the station following their arrest are admissible because the primary taint of the illegal stop and detention was purged. Jerrel Grant objects to the magistrate judge's ruling that he does not have standing to challenge the stop of the automobile. The court will address Jerrel Grant's objections first.[6]

---

consent to search form, although he testified he normally would have done so.

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**4.** The record reflects that the stop of the vehicle occurred at 10:55 a.m. and defendants were arrested at 11:20 a.m. Jerrel Grant's statement was taken at 2:28 p.m. and Delmer's was taken at 3:20 p.m.

**5.** A vehicle travelling fifty-five miles per hour covers 80.7 feet per second. Officer Calvi testified that the left tires of the Grant car touched the divided white line for approximately thirty feet, or approximately one half of one second.

**6.** The court's review of these issues is de novo pursuant to 28 U.S.C. § 636(b)(1)(B).

## II. Passenger Challenge of Illegal Stop

Although the magistrate judge found that Jerrel Grant was illegally seized, he accepted the government's argument that Jerrel may not challenge that seizure because he does not have standing to do so. Jerrel Grant, on the other hand, argues that he has standing to challenge the stop, as opposed to the search, of the vehicle, citing authority from several federal and state courts. However, the relevant inquiry has been mischaracterized.

■ In *Rakas v. Illinois,* 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court "reaffirmed the principle that the 'rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure.' " *Id.* at 138, 99 S.Ct. at 428. The Court went on to reject any consideration of "standing" as distinct from substantive Fourth Amendment doctrine. *Id.* at 139, 99 S.Ct. at 428 (observing that "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing"). Thus, after *Rakas,*

> the question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained [as a result of] it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect.

*Id.* at 140, 99 S.Ct. at 429.[7] Accordingly, the court must first determine whether, under all

the circumstances, Jerrel Grant was seized in violation of the Fourth Amendment.[8]

"Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Florida v. Bostick,* — U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968)). In other words, a police-citizen encounter constitutes a seizure if "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *Id.,* —— U.S. at ——, 111 S.Ct. at 2387 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 569, 108 S.Ct. 1975, 1977, 100 L.Ed.2d 565 (1988)).

This case is governed by the Supreme Court's holding in *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). In *Prouse,* a passenger[9] travelling in a car stopped by the police for a random document check challenged the admissibility of marijuana seized as a result of the stop.[10] *Id.* at 650, 99 S.Ct. at 1394. The question before the Court was

> whether it is an unreasonable seizure under the Fourth and Fourteenth Amendments to stop an automobile, being driven on a public highway, for the purpose of checking the driving license of the operator and the registration of the car, where there is neither probable cause to believe nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connec-

**7.** The *Rakas* court went on to hold that non-owner passengers generally may not challenge the *search* of a vehicle since they ordinarily do not possess the requisite expectation of privacy in the car. 439 U.S. at 148–49, 99 S.Ct. at 432–33.

**8.** As previously noted, the government concedes that Delmer Grant was illegally seized under the circumstances of the stop and detention.

**9.** Prouse was the only occupant of the car whose challenge was considered by the Court. Al-

though the state supreme court opinion mistakenly referred to Prouse as the driver of the vehicle, the record showed that Prouse was a passenger in the back seat. The trial court referred to Prouse as one of four occupants of the car. *Prouse,* 440 U.S. at 650 & n. 1, 99 S.Ct. at 1394 & n. 1.

**10.** The officer smelled marijuana as he approached the vehicle and seized it in plain view.

tion with the violation of any other applicable law.

*Id.* Noting the "physical and psychological intrusion visited upon the occupants of a vehicle ... [when] law enforcement officers signal a moving automobile to pull over to the side of the roadway, by means of a possibly unsettling show of authority," *id.* at 657, 99 S.Ct. at 1398, the Court affirmed the lower court decision holding that the evidence must be suppressed because the stop violated Prouse's Fourth Amendment rights. *Id.* at 650–51, 663, 99 S.Ct. at 1394, 1401. *Prouse* thus acknowledged that a roadside stop is a sufficient show of authority to subject the driver and passengers alike to the intrusion of the state, and thus, cannot be undertaken without at least reasonable articulable suspicion to believe the car or one of its occupants is subject to seizure. *See also California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) (acknowledging that police cruiser with flashing lights is adequate show of authority to constitute a Fourth Amendment seizure).

Since *Prouse,* the Supreme Court has continued to recognize the Fourth Amendment interests of passengers in remaining free from unjustified automobile stops. In *Berkemer v. McCarty,* 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Court considered whether *Miranda* warnings must be given to persons during a roadside stop for a minor traffic offense. The Court stated that

It must be acknowledged at the outset that *a traffic stop significantly curtails the "freedom of action" of the driver and passengers,* if any, of the detained vehicle. Under the law of most States, it is a crime either to ignore a policeman's signal to stop one's car or, once having stopped, to

drive away without permission.... Certainly few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so. Partly for these reasons, we have long acknowledged that "*stopping an automobile and detaining its occupants constitute a 'seizure'* within the meaning of [the Fourth] Amendmen[t], even though the purpose of the stop is limited and the resulting detention quite brief."

*Id.* at 436–37, 104 S.Ct. at 3148 (citing *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979)) (emphasis added).

Finally, in *United States v. Hensley,* 469 U.S. 221, 226, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985), Justice O'Connor wrote that

[a]lthough *stopping a car and detaining its occupants constitutes a seizure* within the meaning of the Fourth Amendment, the governmental interest in investigating an officer's reasonable suspicion, based on specific and articulable facts, may outweigh *the Fourth Amendment interest of the driver and passengers in remaining secure from the intrusion.*

(citing *Prouse* ).

*Prouse* and its progeny thus clearly indicate that "even though the purpose of the stop is limited and the resulting detention quite brief," *Prouse,* 440 U.S. at 653, 99 S.Ct. at 1396, signalling a car to pull over and detaining it by the side of the road while questioning its occupants amount to a coercive show of governmental authority which "significantly curtails the 'freedom of action' of the driver [as well as] the passengers." *Berkemer,* 468 U.S. at 436, 104 S.Ct. at 3148.[11]

---

11. The court notes that were the rule otherwise, overzealous police officers could conduct with impunity precisely the random stops disapproved in *Prouse,* by stopping automobiles without probable cause or articulable suspicion, questioning any passengers, seeking permission to search, and observing the visible contents of the vehicle, knowing that at least the passenger could not successfully challenge the stop. Such a scenario is not permitted by the Fourth Amendment.

Numerous federal and state courts likewise have concluded that passengers may challenge the illegal stop of an automobile in which they were travelling. *See United States v. Rusher,* 966 F.2d 868, 874 n. 4 (4th Cir.), *cert. denied,* —

U.S. ——, 113 S.Ct. 351, 121 L.Ed.2d 266 (1992) (holding that passengers "have standing to argue that the initial stop of the truck and their ejections from it were pretextual and thus illegal"); *United States v. Morgan,* 936 F.2d 1561 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1190, 117 L.Ed.2d 431 (1992); *United States v. Erwin,* 875 F.2d 268, 270 (10th Cir.1989) ("Drivers and passengers have similar interests in seeing that their persons remain free from unreasonable seizure."); *United States v. Portwood,* 857 F.2d 1221, 1222 (8th Cir.1988), *cert. denied,* 490 U.S. 1069, 109 S.Ct. 2073, 104 L.Ed.2d 638 (1989) (passenger ordered out of car and frisked may challenge stop of the vehicle); *United States*

In the instant case, Officer Calvi, acting without reasonable articulable suspicion or probable cause for doing so, signalled the Grant vehicle to pull over by use of his flashing blue lights, bright lights, and siren. He then removed Delmer Grant from the car, locked him in the back of the squad car, and asked him questions about his destination and the purpose of the trip. When he became suspicious because Delmer Grant seemed overly nervous, he questioned Jerrel Grant outside of the presence of his travelling companion, who was still locked in the back of the squad car, in an effort to uncover possible criminal activity. As the Supreme Court has noted, such a stop entails both an "objective intrusion—the stop itself, the questioning, and the visual inspection ... [as well as a] subjective intrusion—the generating of concern or even fright...." *United States v. Martinez–Fuerte*, 428 U.S. 543, 558, 96 S.Ct. 3074, 3083, 49 L.Ed.2d 1116 (1976). A reasonable passenger in the position of Jerrel Grant, travelling in an automobile hailed to the side of an interstate highway by the flashing lights and siren of a police cruiser, whose travelling companion is removed from the car and locked in the back of the squad car, and who himself is then questioned by police, removed from his car and placed in the back of a police cruiser, would not feel at liberty to refuse to answer police questions or to "ignore the police presence and go about his business." *Bostick,* —— U.S. at ——, 111 S.Ct. at 2387.[12]

v. *Durant,* 730 F.2d 1180, 1182 (8th Cir.), *cert. denied,* 469 U.S. 843, 105 S.Ct. 149, 83 L.Ed.2d 87 (1984) (same); *United States v. Thomas,* 787 F.Supp. 663, 669 (E.D.Tex.1992) (passenger may challenge stop); *United States v. McQuagge,* 787 F.Supp. 637, 652 (E.D.Tex.1991) (same); *United States v. Lawson,* 782 F.Supp. 1546, 1548 (S.D.Fla.1992) (same); La Fave, § 11,3(3) at 324–25 (citing numerous state supreme court cases upholding passenger's right to challenge stop). *Cf. Keller v. Frink,* 745 F.Supp. 1428, 1430 (S.D.Ind.1990) (civil rights action holding that "intent to stop car includes intent to stop everyone inside the car").

Although the magistrate judge concluded that his decision that passengers do not have standing to challenge illegal vehicle stops was compelled by the Sixth Circuit's decision in *United States v. Pino,* 855 F.2d 357 (6th Cir.1988), *modified,* 866 F.2d 147 (6th Cir.1989), *cert. denied sub nom. Llera v. United States,* 493 U.S. 1090, 110 S.Ct. 1160, 107 L.Ed.2d 1063 (1990), the court concludes that the Sixth Circuit has not yet ad-

### III. Fruit of the Poisonous Tree

"The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963). To determine whether the tangible evidence and defendants' statements must be suppressed as fruit of the illegal stop and detention, the court must determine whether the statements were "come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 83 S.Ct. at 417.[13]

#### A. The Tangible Evidence

The government concedes that the drugs and weapons found in the car were the fruit of the illegal detention of Delmer Grant. However, since the court determined that Jerrel Grant also was unlawfully seized, the court must determine whether the tangible evidence also must be suppressed as the fruit of the illegal detention of Jerrel Grant. In *Wong Sun* the Supreme Court considered whether it should exclude narcotics taken from one defendant as the fruit of statements which were illegally obtained from another defendant and which directly led to the discovery of the narcotics. 371 U.S. at 487, 83 S.Ct. at 417. Because the government could not show either that it learned of the evidence from an independent source or that the discovery of the evidence had "become so

dressed the issue. The *Pino* court relied on *Rakas* to determine that the passenger could not challenge the *search* of the vehicle because he had not demonstrated the requisite privacy interest in the vehicle or its contents. The court then upheld the legality of the *stop* without ever addressing whether the passenger could challenge the stop and thereby the evidence from the search as fruit of the poisonous tree.

12. At any rate, such a stop cannot be termed a consensual encounter. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

13. The fruit of the poisonous tree doctrine serves the dual purposes of "deterring lawless conduct by federal officers" and "closing the doors of the federal courts to any use of evidence unconstitutionally obtained." *Brown v. Illinois,* 422 U.S. 590, 599, 95 S.Ct. 2254, 2259, 45 L.Ed.2d 416 (1975) (quoting *Wong Sun,* 371 U.S. at 486, 83 S.Ct. at 416).

attenuated as to dissipate the taint," the Court held that the evidence must be excluded. *Id.* at 487, 83 S.Ct. at 417. The government in the instant case likewise can show no independent source or attenuating circumstances resulting in dissipation of the taint of the illegal seizure.[14] Indeed, the officers' detection of the smell of marijuana and the events that followed resulted directly from the seizure, detention, and questioning of Jerrel Grant. Since the drugs and weapons found in the car were obtained by exploitation of that illegal seizure, they must be suppressed. *Id.* at 488, 83 S.Ct. at 417.

### B. The Defendants' Statements

The government contends that the statements of the defendants should be admitted because the taint of the illegal seizures had been purged by the time those statements were made. The Supreme Court has identified several factors that should be considered in determining whether the primary taint of illegal police conduct has been purged: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, ... and, particularly, the purpose and flagrancy of the official misconduct." *Taylor v. Alabama,* 457 U.S. 687, 690, 102 S.Ct. 2664, 2667, 73 L.Ed.2d 314 (1982); *Dunaway v. New York,* 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979); *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975). The government bears the burden of proving that the confessions are admissible. *Taylor,* 457 U.S. at 690, 102 S.Ct. at 2666.

In support of its position, the government contends that Officer Calvi's smelling marijuana while questioning Jerrel Grant and his subsequent discovery of marijuana in the trunk of the car were intervening circumstances breaking the causal connection between the illegal stop and the defendants' confessions. This argument is without merit. Officer Calvi's detection of marijuana, con-

trary to purging the taint of the illegal stop, was itself derived only by "exploitation of that illegality." *Id.* at 692–93, 102 S.Ct. at 2668 (evidence which is itself the fruit of illegal conduct is not sufficient attenuation to break the causal connection between the illegal conduct and a confession). Accordingly, it cannot be said to purge the taint of the illegal stop merely because it might have provided probable cause to search had the initial stop been legal.

The government also argues that the arrest of defendants and their transportation to the station are sufficient intervening acts to purge the taint of the illegal stop. However, this argument has been rejected by the Supreme Court. *See Taylor,* 457 U.S. at 688–94, 102 S.Ct. at 2666–69. The defendants' arrest and transportation to the station flowed directly from the illegal stop and detention. Moreover, it is clear from the Supreme Court's cases that the intervening circumstances necessary to dissipate the taint of illegal police conduct must be such as would allow the accused the opportunity to consider his options and to ensure that any statement, rather than being the product of the illegal conduct, is the result of an act of free will on the part of the accused. *See Brown,* 422 U.S. at 603 n. 8, 95 S.Ct. at 2262 n. 8 (citing cases); *see also Wong Sun,* 371 U.S. at 491, 83 S.Ct. at 419 (lawful arraignment, release on own recognizance, and voluntary return several days later to make statement sufficiently dissipated taint); *Johnson v. Louisiana,* 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972) (lineup in which accused represented by counsel and following presentment to magistrate was not exploitation of challenged arrest). It is clear that neither Officer Calvi's detection of marijuana in the car or the subsequent arrest of defendants is an intervening act of this nature.[15]

The government further contends that the reading of defendants' *Miranda*

---

**14.** Nor can the government argue that the inevitable discovery exception to the exclusionary rule should apply.

**15.** In *Taylor,* the dissent argued that the defendant's confession should have been admissible because his private meeting with his girlfriend constituted an intervening circumstance which

rendered his confession an act of free will. *Taylor,* 457 U.S. at 700, 102 S.Ct. at 2672 (O'Connor, J., dissenting). The majority disagreed on the facts. *Id.* at 691–92, 102 S.Ct. at 2667–68. In the instant case, defendants met with no one and, in fact, were never outside the presence of police officers during the time between their arrest and confessions.

rights at the time of their arrest and prior to the taking of their confessions were sufficient intervening acts to purge the taint and render their statements voluntary. Although the Supreme Court has acknowledged that "[t]he Miranda warnings are an important factor ... in determining whether the confession is obtained by exploitation of an illegal arrest," *Brown*, 422 U.S. at 603, 95 S.Ct. at 2261, *Miranda* warnings do not in themselves break the causal connection between a confession and an illegal seizure. *Id.* at 603, 95 S.Ct. at 2261; *Taylor*, 457 U.S. at 690, 102 S.Ct. at 2667. This is because "the fact that the confession may be 'voluntary' for purposes of the Fifth Amendment, in the sense that Miranda warnings were given and understood, is not by itself sufficient to purge the taint of the illegal [seizure]." *Taylor*, 457 U.S. at 690, 102 S.Ct. at 2667.

■ The government next contends that the purpose and flagrancy of the official misconduct support a finding that the taint was dissipated by the time defendants gave their statements. In support of its argument, the government claims that Officer Calvi thought that a traffic violation had occurred. However, because the justification for the exclusionary rule is "to motivate the law enforcement profession as a whole—not the aberrant individual officer ... exclusionary rules should embody objective criteria rather than subjective considerations." *Dunaway*, 442 U.S. at 221, 99 S.Ct. at 2261 (Stevens, J., concurring). Thus, the question is not whether the officer himself believed that he had the required degree of justification for the intrusion, but whether that belief was reasonable under the circumstances. *Brown*, 422 U.S. at 613, 95 S.Ct. at 2266 (Powell, J., joined by Rehnquist, J., concurring in part). In the instant case, an officer could not reasonably conclude that there was articulable suspicion or probable cause to believe that touching the divided white line for one half of one second constituted a violation of Memphis Code § 21–99.1.[16] *See id.* at 610–12, 95 S.Ct. at 2265–66 (Powell, J., joined by Rehnquist, J., concurring in part) (contrasting willful or

negligent violations such as those "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" with "technical" violations such as good faith reliance on an invalid warrant or statute later held unconstitutional, and reasoning that the former "would require some demonstrably effective break in the chain of events leading from the illegal arrest to the statement, such as actual consultation with counsel or the accused's presentation before a magistrate for a determination of probable cause, before the taint can be deemed removed").

The government attempts to distinguish the instant case from the illegal arrests in *Brown* and *Taylor* in which the officers made illegal arrests with the express purpose of trying to obtain confessions. However, this distinction is belied by Officer Calvi's own testimony. At least by the time the traffic stop was completed, Officer Calvi detained and questioned defendants on the basis of mere suspicions. The government does not challenge the illegality of this detention. Thus the misconduct in the instant case is indistinguishable from that in *Brown*, *Dunaway*, and *Taylor*, in that it consists of an illegal seizure conducted "in the hope that something would turn up." *Taylor*, 457 U.S. at 693, 102 S.Ct. at 2668 (arrest without warrant based on tip insufficient to provide probable cause); *see also Dunaway*, 442 U.S. at 203, 99 S.Ct. at 2251.

■ Finally, the government contends that the three to four hours between the arrest of defendants and their confessions were sufficient to dissipate the taint of the illegal stop. The government essentially argues that the accused "had every opportunity to consider his situation, to organize his thoughts, to contemplate his constitutional rights, and to exercise his free will." *Taylor*, 457 U.S. at 691, 102 S.Ct. at 2667. However, the Supreme Court rejected precisely that argument in *Taylor* when it held that a six-hour time lapse between an illegal seizure and confession was insufficient *without additional intervening circumstances* to purge the taint of the illegal conduct.[17] *Id.* The

---

16. That the question is not even arguable is evidenced by the government's failure to raise objections to the findings and recommendation of the magistrate judge on that issue.

17. In *Taylor*, the government attempted to distinguish the Court's previous decisions in *Brown* and *Dunaway* by pointing out that in those cases, defendants confessed within two hours of the

Court's decisions in this area clearly demonstrate that dissipation of the taint is not necessarily accomplished through the mere passage of time, but by circumstances that reduce the likelihood that a confession was motivated by or resulted from the exploitation of the official misconduct. *Id.* (passage of six hours' time insignificant where accused "was in police custody, unrepresented by counsel, and he was questioned on several occasions, fingerprinted, and subjected to a lineup"); *Dunaway*, 442 U.S. at 220, 99 S.Ct. at 2260–61 (Stevens, J., concurring) (observing that "[t]he temporal relationship between the arrest and the confession may be an ambiguous factor. If there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one."). *Cf. Wong Sun*, 371 U.S. at 491, 83 S.Ct. at 419 (lawful arraignment, release on own recognizance, and voluntary return several days later to make statement sufficiently dissipated taint); *Johnson v. Louisiana*, 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972) (lineup in which accused represented by counsel and following presentment to magistrate was not exploitation of challenged arrest). Since the government has failed to meet its burden in demonstrating that the primary taint of the illegal seizures had been purged, defendants' confessions also must be suppressed.

For the foregoing reasons, the motions of Delmer Dee Grant and Jerrel Grant to suppress tangible evidence and statements are hereby granted.

IT IS SO ORDERED.

---

illegal conduct while Taylor confessed a full six hours following his illegal arrest. Absent additional intervening circumstances rendering the confession an act of free will, the Court refused to find that the taint was purged by the mere passage of six hours. 457 U.S. at 692, 102 S.Ct. at 2668.