NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0085n.06
Filed: November 12, 2004

No. 03-4139

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| DARYL BALDWIN, | ) | DISTRICT OF OHIO |
| | ) | |
| Appellee. | ) | |
| | ) | |

Before: DAUGHTREY, SUTTON, Circuit Judges; COOK, District Judge.[*]

COOK, District Judge. The Government appeals an order suppressing evidence which, in its opinion, supports a charge against the Defendant, Daryl Baldwin, of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The district court, after concluding that the investigative stop of the car in which Baldwin was a passenger was illegal, suppressed all of the evidence which followed the stop. For the following reasons, we affirm.

I.

Shortly before 5:00 a.m. on January 19, 2003, Officer Thomas Coombs of the Cincinnati Police Department ("CPD") was on patrol in a marked police car in the "Over-the-Rhine" area, a

---

[*]The Honorable Julian Abele Cook, Jr., United States District Judge for the Eastern District of Michigan, sitting by designation.

reputed high-crime neighborhood, when he heard the sound of multiple gunshots. After seeing an individual running from the intersection of Greene and Elm Streets, he and a fellow officer, Carl Blackwell, gave chase in separate patrol cars in an effort to locate the person who was responsible for the shooting. Although their collective efforts were unsuccessful, Coombs and Blackwell came across a parked car near the Greene/Elm intersection on Pleasant Street.[1] They got out of their patrol cars to investigate, approached the parked vehicle on foot without their weapons being drawn, and found Baldwin and his uncle, Eric Gilchrist, sitting on the front seats.

When they were questioned about the shooting incident by the officers, Baldwin and Gilchrist denied having any knowledge about the gunshots. The record is not completely clear as to what transpired next. The Government claims that Baldwin and Gilchrist consented to a personal search by the officers. According to Coombs, Gilchrist said, "[w]e don't have anything on us. You can check me." Baldwin, after echoing his uncle's sentiments, was instructed to exit the vehicle. Gilchrist, however, testified that Blackwell, without making any introductory comments, opened the driver's door and immediately placed him in handcuffs in a squad car.

As Baldwin attempted to leave his car, he appeared to hesitate. In an effort to prevent Baldwin from reentering the vehicle, Coombs blocked the passenger doorway, spun him around, and conducted a pat down search. Baldwin broke free of Coombs's grasp and ran north on Pleasant Street. Coombs, along with a third officer, pursued Baldwin who was eventually tackled by them and subdued with mace.[2] During the skirmish, Coombs retrieved a firearm from Baldwin's coat pocket.

---

[1]Pleasant Street is a northbound one-way street, that was described by Coombs at the suppression hearing as "small" and "little." J.A. at 62.

[2]The encounters with Baldwin and Gilchrist eventually involved a total of four officers. However, the record does not indicate when the two additional officers appeared on the scene to assist Blackwell and Coombs during their investigation.

Following the altercation, Baldwin was placed in the back of Coombs's squad car where he was advised of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Baldwin indicated that he understood his rights, and then made incriminating statements regarding the firearm. Baldwin was indicted on March 20, 2003. Four days later, Gwen Gregory, an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), transported him from the county jail to the federal courthouse for a court appearance. During the trip, Gregory read *Miranda* warnings to Baldwin who indicated that he understood them. Baldwin thereafter made incriminating statements regarding his purchase of the gun and admitted that he was a convicted felon. When shown a photograph of the firearm at a later time, he identified it as the gun that was possessed by him on January 19, 2003.

On May 2, 2003, Baldwin filed a motion to suppress evidence of the firearm and his two incriminating statements, contending that the arrest was illegal and all subsequently obtained evidence was inadmissible. On August 23, 2003, the district court granted the motion, finding that (1) the police had "seized" Baldwin within the meaning of the Fourth Amendment immediately upon approaching Gilchrist's vehicle and (2) the subsequent pat down procedure by Coombs was an "exploitation of the illegal stop." J.A. at 28, 31. In making this finding, the district court reconciled the two different versions of events that had been cited by the parties by accepting the testimonies of Coombs and Gilchrist. Noting that the "two lines of testimony are not necessarily incompatible," the district court gave credence to (1) Coombs, who testified during the suppression hearing that he had been told by Baldwin and Gilchrist that he could check them since they did not "have anything" on them, and (2) Gilchrist, whose testimony indicated that he had been ordered out of the car by Blackwell, handcuffed, and placed in the police cruiser within a minute of the officers' approach. J.A. at 25.

## II.

3

The Court reviews the factual findings of a district court in a suppression hearing for clear error, and reviews its conclusions of law, such as the existence or absence of probable cause, on a de novo basis. *United States v. Couch,* 367 F.3d 557, 560 (6th Cir. 2004). The determination by the district court as to whether the facts establish an unconstitutional seizure under the Fourth Amendment is a question of law that we review de novo. *United States v. Avery*, 137 F.3d 343, 348 (6th Cir. 1997).

### III.

The Government initially argues that the district court erred in determining that the initial approach by the CPD officers represented a warrantless seizure in violation of the Fourth Amendment to the Constitution. According to the Government, no seizure occurred because Coombs merely directed some questions to Baldwin who subsequently consented to a search. Accordingly, we must now seek to determine whether the facts in this case support a finding that the initial contact by the officers constituted a seizure or a consensual encounter. *See United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2002).

"[A] warrantless search or seizure is '*per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions.' Consent is one such exception." *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). It is clear that "[l]aw enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002).

A consensual encounter becomes a seizure when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). In *Mendenhall*, the Supreme Court set

4

forth several factors which, if present, indicate that a seizure has occurred. Such factors include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554.

Upon our review of the record, we conclude that the encounter which took place on January 19, 2003, was not consensual. One major factor which supports this conclusion is the setting of the incident. "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988).

In this case, the encounter took place during the early morning hours in the middle of winter. Gilchrist's vehicle represented the only occupied car in an area that had, according to Coombs, "no vehicle traffic [and] no pedestrian traffic." J.A. at 71. Blackwell approached from the south and parked two feet behind Gilchrist's car. Coombs, by contrast, approached from the north and parked his car in front of Gilchrist's vehicle. The position of the two police cruisers effectively surrounded and blocked Gilchrist car on what was described by Coombs as a "small" one-way street. Given this configuration of vehicles at the time of the encounter, a reasonable person in Baldwin's situation would not have felt free to leave the area. In fact, it is unclear whether Gilchrist and Baldwin could have exited the area even if they felt free to do so.[3]

The conduct of the police officers also demonstrates that a seizure occurred as soon as they approached Gilchrist's vehicle. The police officers did not ask Baldwin or Gilchrist to merely

[3]The district court "assume[d]" that Gilchrist could not pull his car forward without hitting Officer Coombs' car. J.A. at 29. However, the court also noted that this assumption was not necessary for its finding that the officers seized Gilchrist's car upon approach. *Id.* In any event, the fact that Gilchrist's vehicle was surrounded by two police cars on a small, one-way street at 5:00 a.m. gives rise to an inference that Baldwin and Gilchrist may have felt compelled to stay and answer the police officers' questions.

5

answer some questions. Rather, Coombs sought to determine if either of the two men had heard any gunfire, whereas Blackwell demanded that Gilchrist exit the vehicle.[4] The police officers' tone and compulsory language suggest that they expected Baldwin and Gilchrist to answer their questions and fully comply with their demands. Thus, this situation is unlike the factual scenario in *United States v. Buchanon*, 72 F.3d 1217 (6th Cir. 1995), which was cited by the Government in support of its position on this issue. In *Buchanon*, the Court determined that an initial stop did not constitute a seizure when a police officer assisted individuals whose vehicle was disabled on the side of the highway. Unlike the situation in *Buchanon*, the officers in this case made explicit demands upon Baldwin and Gilchrist which clearly conveyed a message that their compliance was required. Under this situation, it is clear that Baldwin did not feel free to "disregard the police and go about his business." *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (quoting *California v. Hodari D.,* 499 U.S. 621, 628 (1991)). Given the presence of two additional law enforcement officers, coupled with the placement of the patrol cars by Coombs and Blackwell on Pleasant Street, a reasonable person would have felt threatened or intimidated by this type of overwhelming police presence.

Thus, it is our view that the totality of the circumstances surrounding the initial police approach of Gilchrist's parked car would communicate to a reasonable person that he was not free to terminate the encounter. Accordingly, we affirm the conclusion of the district court that the initial encounter between Baldwin and the police officers amounted to a warrantless seizure.

---

[4]It is unclear from the record whether Gilchrist was handcuffed and placed in the squad car before or after the officers were allegedly told that they could "check" Baldwin and Gilchrist. Although the district court credited the testimonies of Gilchrist and Coombs, it did not rely upon Gilchrist's testimony that he was immediately handcuffed and arrested in concluding Baldwin was seized. Since we similarly find that other *Mendenhall* factors were present to signal that a seizure took place, we need not determine whether Gilchrist's arrest affected Baldwin's seizure or consent.

6

IV.

We now turn to whether the challenged seizure was reasonable under the circumstances. A warrantless seizure may be justified as a product of a brief investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968). To justify a *Terry* stop, an officer must point to specific, articulable facts which gave rise to a "reasonable suspicion" that the suspect was engaged in criminal activity. *Terry*, 392 U.S. at 21. A reasonable suspicion exists when, based on the totality of the circumstances, a police officer has a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Our review of a determination by a district court as to whether the police officers possessed a reasonable suspicion must be conducted on a de novo basis. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

We first turn to an examination of the sequence of events which led to Baldwin's encounter with the police. It is undisputed that Coombs heard a series of gunshots in rapid succession. Based on his experience, Coombs opined that he could "pretty well pinpoint where [the shots were] coming from." J.A. at 47-48. Coombs looked to the area (i.e., the intersection of Elm and Greene Streets) from which he believed the gunshots had originated, and immediately saw someone fleeing the area. Thereafter, he and Blackwell made an unsuccessful effort in their patrol cars to locate the individual. We find that the presence of this fleeing individual strongly suggests that the police officers did not have a particularized suspicion to stop and detain Baldwin as a passenger in a parked vehicle on Pleasant Street. Even if the fleeing pedestrian may have been involved in the shooting incident, as the Government contends, there has been no showing of any specific, articulable facts which gave rise to a reasonable suspicion that Baldwin was connected to the firing of the gunshots. The district court opined that "[t]he officers had encountered another person, and

7

that person was fleeing the area. Given that fact, Defendant's presence in the area alone did not provide the officers with reasonable suspicion to believe that he was in any way involved in the suspected shooting." J.A. at 30.

We are further convinced by Coombs' statement that, upon approaching Gilchrist's vehicle, he did not notice anything particularly unusual or dangerous about Gilchrist's vehicle or its occupants. In fact, neither he nor his fellow officer drew their weapons as they advanced upon the parked vehicle. Moreover, there is no evidence that (1) any of the officers knew how long the parked car had been at its location on Pleasant Street prior to their encounter with Baldwin and Gilchrist, or (2) Coombs believed or had reason to believe that either occupant of the vehicle had any connection with the shooting incident at or near the Greene and Elm Street intersection.

The Government submits that there are a number of factors which support a finding of reasonable suspicion. It points out that Coombs and Blackwell were investigating an incident in a high crime area in Cincinnati when they came across Baldwin and Gilchrist in a parked car with its engine and radio off. Although the fact that a stop occurred in a high crime area is "among the relevant contextual considerations in a *Terry* analysis," it is clear that "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Moreover, the fact that Gilchrist's car was parked with its engine and radio off does not support a reasonable suspicion that either Baldwin or his uncle were involved in the shooting. The existence of a solitary parked vehicle during the early morning hours does not present a sufficient articulable suspicion upon which to justify an arrest.

Moreover, the case law, which was cited by the Government, is inapposite. In *United States v. Moore*, 817 F.2d 1105 (4th Cir. 1987), the Fourth Circuit Court of Appeals justified the pat down of the suspect in part because "[t]he hour was late, the street was dark, the officer was alone, and

8

the suspected crime was a burglary, a felony that often involves the use of weapons." *Moore*, 817 F.2d at 1108. This case is distinguishable because the officer in *Moore* determined that the defendant was the *only* person in the vicinity of the suspected burglary. Here, however, Coombs witnessed an unidentified person fleeing the area from which shots had been fired. Furthermore, Coombs was not alone, but was assisted by three other officers at the scene.

The Government's reliance on *United States v. Burton*, 334 F.3d 514 (6th Cir. 2003), is similarly misplaced. The issue in *Burton* involved a request by a police officer to search the vehicle of an individual who was suspected of drug trafficking. Although the *Burton* court found it reasonable for the police officer to ask questions, including his request for consent to search the defendant's vehicle, its holding was restricted to those cases involving traffic violations: "Particularly where, as here, the traffic stop took place on a street known to the police as a high-crime area, we believe that asking a few questions about illegal activity to the driver of an automobile *stopped for a traffic violation* at 11:30 p.m. is not unreasonable." *Burton*, 334 F.3d at 519 (emphasis added). Unlike the defendant in *Burton*, Baldwin and Gilchrist were not stopped for a traffic violation. Rather, Coombs testified that he found nothing suspicious or dangerous about Gilchrist's vehicle. These crucial distinctions underscore the lack of any articulable suspicion by Coombs and Blackwell when they encountered Baldwin and Gilchrist in the parked car.

Given the totality of the circumstances, we conclude that these officers did not have a reasonable suspicion to conduct a pat down examination under *Terry*. It is the Government's burden to demonstrate that a stop based on reasonable suspicion satisfies the conditions of an investigative *Terry* stop. *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990). We find that the Government has failed to meet its burden here. The district court properly determined that the officers stopped Baldwin without any reasonable suspicion in violation of the Fourth Amendment.

9

V.

Since we have concluded that (1) the initial encounter between Baldwin and the police officers was not consensual and (2) the officers did not have any reasonable suspicion to stop and detain Baldwin, all evidence resulting from the illegal search is inadmissible. "The exclusionary rule bars the admissibility of items seized during an unconstitutional search... and of testimony concerning knowledge acquired during such a search." *United States v. Leake*, 95 F.3d 409, 411 (6th Cir. 1996) (internal citations omitted); *see also Wong Sun v. United States*, 371 U.S. 471, 485 (1963). The rule excludes from admissibility evidence later discovered and found to be derivative of an illegality or "fruit of the poisonous tree." *Segura v. United States,* 468 U.S. 796, 804 (1984).

Notwithstanding, it is the Government's contention that even if the initial seizure was illegal, Baldwin's resistance and flight following the pat down search, as well as his voluntary incriminating comments to an ATF agent in March 2003, collectively establish independent sources for the admission of the evidence that was rejected by the district court. In an effort to evaluate the merits of the Government's arguments, we will address these two arguments in turn.

One of the exceptions to the exclusionary rule is the independent source doctrine. In *Wong Sun v. United States,* 371 U.S. 471 (1963), the Supreme Court stated that "the exclusionary rule has no application" when "the government learn [s] ... of the evidence from an independent source." *Wong Sun,* 371 U.S. at 487 (internal quotations omitted). The independent source doctrine deems "evidence admissible in those situations where an illegal search takes place at some point during a criminal investigation, but where a proper, independent search led to the evidence in question." *United States v. Dice*, 200 F.3d 978, 984 (6th Cir. 2000).

On appeal, the Government contends that Baldwin's struggle with Coombs and his subsequent flight provided independent grounds for an arrest, which justified the admission of his initial statement and the firearm. According to the Government, "when Baldwin broke free from

Officer Coombs' pat-down and fled, he committed a new offense that justified his arrest, irrespective of the validity of the initial stop and frisk." Gov't Final Br. at 23. However, the Government overlooks one crucial fact in making this argument; namely, the firearm was discovered by Coombs *before* Baldwin attempted to resist and flee from the scene. The district court found that the officer discovered the gun during the initial pat down, but "did not announce his find aloud." J.A. at 26. Thus, the subsequent detention following Baldwin's resistance failed to reveal any evidence that was not *already known* to Coombs. Consequently, the independent source doctrine does not apply in this instance because the Government did not discover any evidence that was not tainted by the initial illegality.

We similarly reject the case law cited by the Government in support of its argument on this issue. In *United States v. Dawdy*, 46 F.3d 1427 (8th Cir. 1995), for example, a police officer observed the defendant in an automobile parked near a pharmacy late at night. After some questioning, the defendant appeared nervous and opened the car door several times as if to exit his vehicle. Another law enforcement officer found a black leather pouch containing a white, powdery substance lying on top of the snow near the defendant's automobile. When the officer tried to handcuff the defendant, he resisted and attempted to dispose of a trunk key. A subsequent search of the trunk revealed more white powder which was later tested positive as amphetamine. The Eighth Circuit reversed the suppression order by the district court, concluding that even if Dawdy's initial arrest was invalid, his resistance provided "independent grounds for his arrest" and therefore, "the evidence discovered in the *subsequent* searches of his person and his automobile is admissible." *Id.* at 1431 (emphasis added). Here, unlike in *Dawdy*, the subsequent searches of Baldwin by the police officers uncovered no new or additional evidence. Rather, the detention of Baldwin following his resistance revealed only what Coombs already knew – that Baldwin had a firearm in his possession. This critical fact distinguishes the instant case from the cases that were

11

cited by the Government. *See also United States v. Collins*, 200 F.3d 1196 (8th Cir. 2000).

Since the Government did not acquire its evidence from any "independent source," Baldwin's subsequent detention following his flight does not sufficiently purge the taint of the illegal arrest. *Wong Sun*, 371 U.S. at 487. Accordingly, we find that the district court properly suppressed evidence of the firearm and Baldwin's first statement to Coombs.

The Government also contends that even if Baldwin's initial statement after his arrest on January 19, 2003 is inadmissible, the district court erred by suppressing the statement that was made by him to ATF Agent Gregory over two months later on March 24, 2003. In addressing this issue, the Government submits that this second confession is so attenuated from the initial illegal seizure to be admissible.

The Supreme Court has stated that an illegal police action does not render all subsequently discovered evidence inadmissible per se. *See Wong Sun,* 371 U.S. at 487-88. Rather, the critical question is "whether, granting establishment of the primary illegality, the evidence ... has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* (internal quotation marks omitted). A confession obtained through custodial interrogation after an illegal arrest must be excluded from evidence unless it is attenuated enough from the arrest that the confession is "sufficiently an act of free will to purge the primary taint." *Brown v. Illinois*, 422 U.S. 590, 602 (1975).

The Supreme Court in *Brown* established a number of factors that a court should take into account in determining the admissibility of a confession following an unconstitutional arrest:

> The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct are all relevant.

*Brown*, 422 U.S. at 603-04 (internal citations omitted). The Government has the burden of proving

12

the admissibility of a confession following an illegal arrest or search. *Kaupp v. Texas*, 538 U.S. 626, 633 (2003). We will address these *Brown* factors seriatim.

In this case, it is undisputed that Baldwin received fresh *Miranda* warnings from Agent Gregory before making an incriminating statement. Although this factor supports the admission of Baldwin's second statement, *Miranda* warnings by themselves are insufficient to purge the taint of an illegal arrest. *See Brown*, 422 U.S. at 603; *see also United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003).

Hence, an examination of the second *Brown* factor – the temporal proximity between the illegal search and the confession – becomes necessary. The district court concluded that the two month interval between Baldwin's arrest and his second statement failed to dissipate the taint of the illegal stop.

On the basis of the available record, we agree with the district court that the temporal proximity factor does not weigh in favor of admissibility. Contrary to the Government's position, the "mere passage of time" is insufficient to break the chain of causation between an illegal search or arrest and a subsequent confession. *See United States v. Grant*, 822 F.Supp. 1270, 1278-79 (W.D. Tenn.1993); *see also United States v. Parker*, 722 F.2d 179, 186 (5th Cir. 1983), *overruled on other grounds by United States v. Hurtado*, 905 F.2d 74 (5th Cir. 1990) (five month lapse between arrest and confession, standing alone, does not require admission of confession).

The temporal relationship between the initial illegality and the confession is "an ambiguous factor." *Dunaway v. New York*, 442 U.S. 200, 220 (1979) (Stevens, J., concurring). Moreover, the lapse of time between an illegal search and a confession is even less relevant for purposes of admissibility. One noted commentator explained:

> In the typical case in which the defendant was present when incriminating evidence was found in an illegal search or in which the defendant was confronted by the police with evidence they had illegally seized, it is apparent that there has been an

13

"exploitation of that illegality" when the police subsequently question the defendant about that evidence or the crime to which it relates. This is because "the realization that the 'cat is out of the bag' plays a significant role in encouraging the suspect to speak."

Wayne R. LaFave, Search and Seizure §11.4(b) (3d ed. 1996) (footnotes omitted).

Here, Baldwin was confronted with incriminating physical evidence – the firearm – after the illegal search. Faced with this incriminating evidence, he had an incentive to immediately confess to his possession of the firearm. Baldwin's incriminating statement is thus inextricably linked to the discovery of the firearm. Two months later, the link between Baldwin's second statement and the physical evidence of the firearm is virtually unchanged in the absence of any intervening circumstances.[5] The fact that Baldwin was in custody throughout this period does not purge the taint of the illegal search. Indeed, "if there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one." *Dunaway*, 442 U.S. at 220 (Stevens, J., concurring). *See also Taylor v. Alabama*, 457 U.S. 687, 700 n. 6 (O'Connor, J., dissenting) (illegal arrest may be exploited by lengthy detention).

Thus, we find that the two month interval between Baldwin's arrest and his second statement does not – standing alone – favor admission of the second statement. For a comprehensive evaluation of this factor, we must analyze the temporal proximity of Baldwin's seizure and his confession in the context of any intervening circumstances. *See United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003).

The Government contends that the administration of fresh *Miranda* warnings by the ATF

---

[5]Two months after his arrest, and in the absence of any intervening circumstances, (1) the police still had knowledge of physical evidence which connected Baldwin to the crime; (2) Baldwin was aware that the police had knowledge of this physical evidence; and (3) he remains unaware that the initial police action was illegal. As Baldwin remains confronted with this incriminating physical evidence, he continues to have the incentive to confess to possession of the firearm in question.

14

agent represents an intervening circumstance which is sufficient to purge the taint of Baldwin's initial illegal search. We disagree. The Supreme Court has observed that giving of *Miranda* warnings does not sufficiently break the connection between an illegal arrest or search and a confession. *See Taylor v. Alabama*, 457 U.S. 687, 691 (1982) (finding that three *Miranda* warnings by police officers did not constitute "intervening events" to purge original taint of illegal arrest); *Brown*, 422 U.S. at 605. Instead, the types of intervening events that serve to attenuate police misconduct are those that sever the causal connection between the illegal arrest or search and the discovery of incriminating evidence. *United States v. Reed*, 349 F.3d 457, 464 (7th Cir. 2003); *see, e.g., Rawlings v. Kentucky*, 448 U.S. 98, 108-109 (1980) (discovery of other incriminating evidence implicating defendant); Wong Sun, 371 U.S. at 491 (confession was made several days after illegal arrest and was preceded by arraignment and release from custody); *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997) (proper arrest on unrelated charges following initial illegal arrest); *United States v. Fazio*, 914 F.2d 950, 958 (7th Cir. 1990) (defendant freely agreed to speak to police at site away from scene of illegal arrest and drove own vehicle to meeting); *Carnejo-Molina v. INS,* 649 F.2d 1145, 1149 (5th Cir. 1981) (consultation with counsel).

Here, the Government has not set forth any circumstantial evidence in the record to support an intervening circumstance that sufficiently purges the taint of the initial illegality. Through her testimony, Agent Gregory verified that Baldwin was in custody when he was transported to the federal courthouse. There is no indication that Baldwin was ever released from custody prior to his statement to Gregory. This agent's testimony also reveals that Baldwin did not freely volunteer information to her. Rather, she indicated that it is her general practice to routinely administer Miranda warnings to defendants en route to the federal courthouse for their arraignment. The record is devoid of the discovery of additional evidence by the Government or any other circumstances that would sever the connection between the challenged search of Baldwin and his

15

subsequent confession in March 2003. Hence, we find that the Government has failed to sustain its burden of identifying an intervening circumstance such that Baldwin's confession is "sufficiently an act of free will to purge the primary taint" of the illegal seizure. *Brown v. Illinois,* 422 U.S. at 602.

The final factor in the *Brown* analysis is the purpose and flagrancy of the conduct by the police officers. This factor is linked to the purpose of the exclusionary rule; that is, the deterrence of police misconduct. *United States v. Fazio*, 914 F.2d 950, 958 (7th Cir. 1990). While we cannot justifiably characterize the conduct by the investigating officers as "flagrant," we do find that their purpose in making this challenged search was "investigatory" in nature, undertaken "in the hope that something might turn up." *Brown*, 422 U.S. at 605. The police officers neither engaged in a consensual encounter when they approached Gilchrist's vehicle nor did either of them have any reasonable suspicion to stop and detain Baldwin prior to discovery of the firearm. This type of police misconduct – stopping a suspect without probable cause for investigatory purposes – is precisely the type of conduct that *Brown* and its progeny seeks to deter. *See United States v. Miller*, 146 F.3d 274, 280 (5th Cir. 1998); *United States v. Gray*, 137 F.3d 765, 780 (4th Cir. 1998); *see also Taylor v. Alabama*, 457 U.S. 687, 693 (1982) (fact that police effectuated investigatory arrest without probable cause amounted to police misconduct sufficient for suppression of evidence).

In summary, we find that the Government has failed to satisfy its burden of proving that Baldwin's second statement to Agent Gregory was sufficiently purged of the taint of the initial illegal search. In light of the relevant *Brown* factors, we find that any evidence discovered as a result of Baldwin's illegal seizure should be suppressed. Accordingly, the district court's ruling to suppress Baldwin's second statement is affirmed.

V.

For the reasons stated above, we affirm the district court's order to suppress evidence of the

16

firearm and Baldwin's statements.

SUTTON, Circuit Judge, dissenting. As I see it, we need not address two difficult questions in this case—whether the initial encounter with Mr. Baldwin was a consensual one and whether in any event the officers had reasonable suspicion to stop him. Even if we assume that the initial stop was unjustified, the police independently discovered the key item of evidence about which the parties are quarreling, the gun, as a result of intervening causes—Baldwin's resistance and flight—both of which relieve the evidence of any taint from the allegedly unlawful search.

In *Murray v. United States*, 487 U.S. 533 (1988), the Court explained that "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality" does not fall within the exclusionary rule. *Id.* at 537. Balancing the "interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime," the independent-source doctrine permits the introduction of evidence obtained in the absence of any police misconduct. *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 443 (1984)). Without the doctrine, in point of fact, the police would be "in a worse position than they would have been in absent any error or violation." *Id.* (quoting *Nix*, 467 U.S. at 443).

The "classic independent source situation," we said in *United States v. Leake*, 95 F.3d 409 (6th Cir. 1996), occurs when the independent source is "unrelated to and independent of the unconstitutional search." *Id.* at 412. Unrelatedness under the independent-source rule, however, does not preclude "all evidence [as] 'fruit of the poisonous tree' simply because it would not have come to light *but for* the illegal actions of the police." *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963) (emphasis added). "[T]he more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be

purged of the primary taint.'" *Id.*; *see also United States v. Ceccolini*, 435 U.S. 268, 276 (1978) (declining to adopt a "but for" rule "that would make inadmissible any evidence, whether tangible or live-witness testimony, which somehow came to light through a chain of causation that began with an illegal arrest").

In this case, any connection between the allegedly improper stop and the discovery of the weapon was attenuated, and indeed broken, by Baldwin's independent actions. When an officer conducts a full-blown search or a *Terry* pat-down and the subject of the search breaks free from the grasp of the officer, officers generally pursue the individual, not to exploit the illegal arrest, but because the intervening act itself creates reasonable suspicion, if not a palpable risk of danger to officers and citizens in the area. As the Supreme Court explained in *Illinois v. Wardlow*, 528 U.S. 119 (2000), "evasive behavior is a pertinent factor in determining reasonable suspicion" and "[h]eadlong flight . . . is the consummate act of evasion." *Id.* at 124 (holding that presence in a high-crime area and flight from police combined to create reasonable suspicion); *see also Watkins v. City of Southfield*, 221 F.3d 883, 889 n.3 (6th Cir. 2000) (noting that the development of reasonable suspicion may take into account all events occurring prior to the physical apprehension of a suspect who flees); *United States v. Garcia*, 516 F.2d 318, 320 (9th Cir. 1975) (finding no taint to evidence discovered after the defendant fled an illegal stop at an immigration checkpoint in his car and was subsequently stopped after a high-speed chase); *United States v. Castillo*, No. 99-5463, 2000 WL 1800481, at *5 (6th Cir. Nov. 28, 2000) (unpublished) (noting that "a defendant's flight from the scene of an illegal *Terry* stop and his use of force against an officer dissipated the taint arising from the illegal seizure").

When Baldwin broke free from Officer Coombs' grasp after the officer placed his hand on Baldwin's pocket and when he fled from the officers, he created the necessary reasonable suspicion to justify a stop. Because this second stop was prompted by Baldwin's independent actions, was

19

supported by reasonable suspicion and was not in any way an exploitation of the original stop, *cf. Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (observing that the existence (or absence) of police misconduct is relevant to whether a subsequent confession should be suppressed as tainted), it provided an independent source for the admission of the gun against Baldwin, untainted by any illegality of the original stop. To put the point another way, consider what would have happened if Baldwin had fled as soon as the officers came upon the scene. In that setting—(1) where officers had been called to a neighborhood in which shots had just been fired (2) in a high-crime area (3) late at night and (4) with a fleeing suspect—there can be little doubt after *Wardlow* that reasonable suspicion would exist. Why should this case be any different? The officers had the first three pieces of information before they arrived on the scene, and they obtained the last piece of information not because they did anything unusual in patting down Mr. Baldwin (or in otherwise exploiting the stop) but because Baldwin independently chose to bolt.

The majority's approach, moreover, harms "the public interest in having juries receive all probative evidence of a crime,"*Murray*, 487 U.S. at 537, without offering any appreciable protection to criminal defendants. Consider: a police officer who, like Coombs, pats down a suspect after an illegal stop must now watch the suspect run off into the distance, without giving chase, fully knowing that the suspect is armed and quite possibly dangerous. That cannot be right. The exclusionary rule protects those who follow police direction after an illegal stop, not those who seek to escape out of a sense of panic or on their own suspicion that a police search is unsupported.

One other point: I cannot agree with the majority's apparent reliance on the fact that the final apprehension of Baldwin "failed to reveal any evidence that was not *already known* to Coombs." Maj. Op. at 11 (emphasis in original). Justice Holmes's original use of the term "independent source" specifically applied "to that particular category of evidence acquired by an untainted search *which is identical to the evidence unlawfully acquired*." *Murray*, 487 U.S. at 538

20

(emphasis in original); *see Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920) (Holmes, J.).  The mere fact that the evidence at issue has once been discovered cannot insulate it from subsequent independent discovery.

I would reverse the suppression of the firearm and accordingly respectfully dissent from the majority's contrary conclusion.