MARK A. GOLDSMITH, United States District Judge
This matter is before the Court on Defendant Lomnil Jackson's motion to suppress *524 all of the physical evidence seized during a pat-down search of his person and subsequent search of an apartment, both of which occurred on the same day in Huntington, West Virginia (Dkt. 543). Jackson also requests a hearing pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The Government has filed a response in opposition to the motion (Dkt. 585), to which Jackson replied (Dkt. 592). The Court conducted an evidentiary hearing on February 11, 2019,[1] after which Jackson and the Government filed supplemental briefs (Dkts. 824, 845, respectively). For the reasons discussed below, the Court grants the motion in part and denies it in part.
I. BACKGROUND
A federal grand jury returned a second superseding indictment on February 28, 2018, charging the eleven defendants in this case with various crimes, including violations of the Racketeering Influenced and Corrupt Organizations Act (the "RICO" Act), 18 U.S.C. § 1961 et seq. See generally 2d Superseding Indictment (Dkt. 292). The indictment claims that Defendants were members and associates of a criminal enterprise-the "6 Mile Chedda Grove" street gang in Detroit-one of whose purposes was to "preserv[e] and protect[ ] the power, territory, reputation, and profits of the enterprise through murder, robberies, intimidation, violence, and threats of violence." Id. at 2, 6. The enterprise purportedly operated on the east side of Detroit within an area bordered roughly by East McNichols Road to the north, Kelly Road to the east, Houston-Whittier Street to the south, and Chalmers Street to the west. Id. at 2.[2]
The indictment further alleges that the enterprise's profits derived primarily from the sale and distribution of controlled substances, including crack cocaine, heroin, and morphine. Id. at 5. The sale and distribution alleged was not limited to Michigan; gang members and associates purportedly sold and distributed controlled substances in Ohio, Kentucky, Tennessee, Alabama, and West Virginia. Id.
Six of the eleven defendants have since pleaded guilty.[3] The five remaining defendants have been separated into two groups with separate trial dates. See 8/7/2018 Order (Dkt. 425). Group One is composed of three defendants who are not subject to the death penalty upon conviction. Two of these defendants, Donell Thompson and Lomnil Jackson, have a trial date of May 7, 2019. See 8/28/2018 Order (Dkt. 464); 2/22/2019 Minute Entry (adjourning Group One trial date). The other Group One defendant, Robert Baytops, will have a separate trial at a future date. See 3/26/2019 Order (Dkt. 846) (granting Thompson's motion for severance). Group Two, composed of two defendants who are death-penalty eligible, has a trial date of April 21, 2020. See 8/31/2018 Order (Dkt. 475).
Jackson, who belongs to Group One, has been charged with one count of racketeering conspiracy in violation of 18 U.S.C. § 1962(d) (Count One); one count of murder in aid of racketeering in violation of *525 18 U.S.C. § 1959(a)(1) (Count Four); one count of using and carrying a firearm during and in relation to a crime of violence causing death in violation of 18 U.S.C. §§ 924(c) and 924(j) (Count Five); one count of assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3) (Count Six); and one count of using, carrying, and discharging a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c) (Count Seven). See generally 2d Superseding Indictment.
Jackson's motion to suppress concerns overt act 40 in the second superseding indictment, see id. at 16 ("On or about June 8, 2015, LOMNIL JACKSON was present inside of a residence in which two firearms, cocaine, and oxycodone were found in Huntington, West Virginia."), as well as overt act 41, see id. at 17 ("On or about June 8, 2015, LOMNIL JACKSON possessed marijuana in Huntington, West Virginia."). The facts surrounding these overt acts in Huntington, West Virginia, were developed further during the evidentiary hearing, at which Huntington Police Department Detectives Adrian Rosario and Benjamin Butler, Huntington Police Department Sergeant Paul Hunter, and Jackson testified.
At around 8:00 a.m. in the morning of June 8, 2015, about ten to fifteen Huntington Police Department officers, which included members of the department's SWAT team, went to an apartment building in Huntington, West Virginia, to execute a search warrant. 2/11/2019 Hr'g Tr. at 8-9, 58-61, 83-84, 104, 110 (Dkt. 813). The apartment building itself was a two-story rectangular structure running north and south with adjoining apartments. Id. at 8, 9. Apartments located on the first floor were accessible from the exterior of the building, while access to apartments on the second floor was accomplished through internal doors. Id. at 9. The address for apartments on the west side of the building was 1005 Washington Avenue, while the address for apartments located on the east side of the building was 1001 Washington Avenue. Id. at 9, 103, 125.
The search warrant that was executed that morning was for 1005 Washington Avenue, Apartment 8. Id. at 8, 31, 34, 60, 104, 125. Jackson and Javonte Jennings were in 1001 Washington Avenue, Apartment 4. A common wall served as the backwall for both Apartment 8 and Apartment 4. Id. at 37-38. To gain entry to Apartment 8 and execute the search warrant, officers broke a large sliding glass door while, at the same time, loudly announcing that they were police officers. Id. at 38, 65; see also id. at 139 (Jackson, who was sleeping in Apartment 4, testified that he woke up to the sound of "knocking, banging on doors, [and] glass breaking"). Detectives Rosario and Butler were at the apartment complex to assist the other officers executing the warrant. Id. at 8, 60, 76. Sergeant Hunter was also present at the apartment building because he was the lead investigator and affiant for the search warrant of Apartment 8, but he did not personally participate in gaining entry to that apartment. Id. at 104, 109.
Although officers commonly wear vests identifying them as police when executing a search warrant, id. at 12, Rosario was unsure whether he was wearing a police vest or only had his "badge chain out" that morning, id. at 12, 18-19. However, Butler recalled wearing a "raid vest," and that the other officers at the scene were "marked as [ ] police officer[s]." Id. at 61, 75. Butler's gun was visible on his hip, but he did not draw the weapon. Id. at 74, 93. The SWAT team members were wearing tactical gear, including body armor and helmets, and openly carried long guns and shields. Id. at 62-63, 113. There were also *526 several police vehicles, which may have included a black van marked Huntington SWAT. Id. at 63-64.
Approximately one week before the execution of the search warrant at Apartment 8, either Hunter or another officer at the Huntington Police Department had received a complaint about possible drug activity at 1001 Washington Avenue, Apartment 4 from the landlord of the apartment complex. Id. at 10, 16, 28-30, 104, 106-107, 128. The police department did not receive any specific drug complaints about Jackson or Jennings, id. at 15, 16, and the investigation at the apartment building leading up to the execution of the search warrant that morning did not involve either Jackson or Jennings, id. at 121.
While Rosario and Butler were waiting for the other officers to complete the search warrant at the apartment building, Hunter directed the two detectives to perform a knock-and-talk at Apartment 4 based on that prior drug complaint. Id. at 9-10, 66, 87, 114, 116, 128. Butler described a typical knock-and-talk procedure as follows:
[Y]ou knock loud enough if someone's going to answer the door just like ... if I was supposed to meet you at a friend's house, I would walk up, knock on the door, it's that kind of thing. You want somebody to answer the door, and once they answer the door, then you identify yourself and explain the reason why you're there.
Id. at 70. He further stated that, for a normal knock and talk, an officer "might spend a minute or two" at the door, "to make sure that ... they've had an opportunity to hear you and then when you, obviously they're not coming to the doorway, then you would leave." Id. at 98; see also id. at 100 ("If I was going to go to somebody's house, just say I was going to go to your house and I knocked on the door and you weren't there, I didn't believe that you were there, nobody came to the door, I'm not going to stay there for any extended period of time. We've knocked, no one's answering, we're going to leave."). Hunter similarly stated that "it wouldn't be common to stand and knock on a door for, I mean, we've knocked many times before and if someone didn't answer the door after a short period of time, more times than not, you would leave 'cause there's no reason to stand at a door that no one's answering." Id. at 118.
Rosario and Butler's first attempt at a knock-and-talk would have taken place around 8:50 a.m., and it lasted for about two to three minutes. Id. at 10, 35. Although Butler is unsure who knocked on the apartment door the first time, Rosario stated that he knocked on the door of Apartment 4 "at one point." Id. at 10. According to Rosario, he and Butler "knock[ed] on the door with presence," but not to the same degree as when they execute search warrants. Id. at 12, 38. Butler described the knocking as being "loud enough that someone [will] hear it and answer the door." Id. at 67. Hunter did not remember exactly how loud Rosario and Butler were knocking on the door of Apartment 4, but he did state that officers generally knock with "presence" "to make sure that we can wake someone up." Id. at 117. Unlike a casual knock on the door that someone might use when invited over to a friend's house for dinner, Hunter referred to this type of knocking as a "law enforcement knock." Id. ("We want you to know that we're here and we'd like for you to come to the door.... It's the police, we're the police, and we'd like you to come to the door."). And according to Jackson, the officers were not so much knocking on the apartment door as they were banging loudly on it. Id. at 140.
*527 In addition to knocking, Rosario and Butler were also announcing their presence as members of the police department. Id. at 12. Approximately ten to fifteen officers and SWAT members were still within the perimeter of the apartment and would have been visible if someone within Apartment 4 looked out the window. Id. at 9, 68-69, 87, 114-115. In fact, Jackson claimed that he looked out the apartment window when Rosario and Butler were knocking on the apartment door and saw "officers like SWAT, they had SWAT gear on, a tank like a big black metal van, ... couple cop cars, a lot of officers, dogs, [and] rifles." Id. at 141.
After they received no response to their knocking, Rosario and Butler then leisurely hung around the area, approximately ten to fifteen feet from Apartment 4, and discussed the execution of the prior search warrant with other officers at the scene. Id. at 10-11, 35-36, 53, 88-89. Rosario testified that he did not believe anyone was going to come out of Apartment 4 after the first knock-and-talk attempt. Id. at 53. Nevertheless, Rosario and Butler went back to Apartment 4 about ten minutes later and again knocked for about two to three minutes. Id. at 11, 17, 69, 89. Still no response. Id. at 11.
Rosario and Butler then turned around and began to walk away when Jackson and Jennings opened the door and exited Apartment 4. Id. at 11, 13, 36-37, 73, 90-91. Rosario and Butler were both surprised that anyone was inside the apartment. Id. at 11, 73. The period of time from the first knock on the door to Jackson and Jennings exiting the apartment was approximately fifteen minutes. Id. at 17, 18, 35, 88. Remarking on its duration, Butler stated that this knock-and-talk was "longer than a normal knock and talk would be." Id. at 88; see also id. at 97-98 (stating that he and Rosario stood in the doorway of the apartment for a longer "amount of time than what a normal knock and talk would" take).
After Jackson and Jennings exited the apartment, Rosario approached Jackson and escorted him approximately seven to eight feet away from the apartment and over to the south side of the apartment building. Id. at 13, 14, 38-39, 51. While using a "tone of presence," Rosario advised Jackson that he was going to conduct an officer safety pat-down search. Id. at 13, 16, 40. Rosario claimed during the evidentiary hearing that he performed the search because Jackson's exiting the apartment after the noisy execution of the earlier search warrant and not responding to the officers' knocking was "suspicious." Id. at 13, 14, 37. During the head-to-toe pat-down search, Rosario noticed a round bulge with a width of about an inch-and-a-half in the Jackson's groin area that did not feel anatomically correct. Id. at 23, 24, 42. When Rosario asked Jackson what the bulge was, Jackson replied that it was marijuana. Id. at 23, 42. Rosario then asked Jackson to remove the marijuana, and Jackson complied. Id. at 42. The object that Jackson removed appeared to be approximately two-and-a-half grams of marijuana. Id. at 23, 43. No other objects, including narcotics or weapons, were found on Jackson during the pat-down search. Id. at 24. During the encounter with Jackson, Rosario also learned that Jackson was from Detroit and did not live in the apartment. Id. at 43-44.
While Rosario was busy with Jackson, Butler focused on Jennings. Id. at 15, 73. Butler called Jennings over in his direction, at which point Butler turned Jennings around and performed a pat-down search for weapons, to which Jennings supposedly consented. Id. at 73, 91-92. This search resulted in the discovery of a marijuana joint. Id. at 94. During the *528 course of this pat-down search, Butler and Jennings were approximately five or six feet away from Rosario and Jackson. Id. at 92. After the discovery of the marijuana on their persons, Jackson and Jennings were placed into custody and arrested. Id. at 44, 47, 94-95.
At some point while Jackson and Jennings were outside of the apartment, Carina Morgan was walking on the sidewalk next the apartment building, and investigators approached her. Id. at 45. Rosario and Hunter knew Morgan because of her drug-related past. Id. at 45, 120, 132. Morgan apparently informed the officers that she had paid Apartment 4's monthly rent for May 2015, but she did not know who currently lived there and claimed that she did not live there anymore. Id. at 46. Butler stated that he learned at some point about a female who had walked up to near the scene and admitted that Apartment 4 was hers. Id. at 95. Hunter similarly recalls Morgan approaching the scene from the south and maybe having a brief conversation with her. Id. at 119, 131. The officers had no other information concerning the occupancy, use, or ownership of the apartment. Id. at 47.
While Rosario wrote a police report involving the circumstances surrounding the arrest of Jackson and Jennings, id. at 19; see also Rosario Incident/Offense Report, Ex. A to Gov't Resp. (Dkt. 585-1), Hunter sought a search warrant for Apartment 4 and prepared an affidavit in support. Hunter provided the following pertinent facts in his affidavit to establish probable cause for the search warrant:
Approximately a week ago officers received a drug complaint, third party, from the landlord about possible drug activity at 1001 Washington Avenue apt. 4.
On 06-08-2015 members of the Huntington police department conducted a knock and talk at the above mentioned apt. Occupants of the apartment refused to open the door for 15 minutes or more. At some point two individuals identified as Santez Underwood and Javonte Jennings came to the door. Both individuals stated they were from Detroit, Michigan and that they didn't live in the apartment. Carina Morgan, also was at the scene and stated that she once lived there but no longer did. Morgan claimed that she dated one of the guys, but could only provide a street name. She claimed that she didn't know who lived in the apartment. Morgan is a known drug dealer and associates with numerous drug dealers. While talking with Jennings, Detective Butler asked him if he could pat him down. Jennings agree [sic]. Butler patted the individual down and found him to be in possession of marijuana and over $600.00 U.S. currency. The marijuana field positive for marijuana.
Hunter Aff. ¶¶ 5-6, Ex. B to Gov't Resp., at PageID.3294 (Dkt. 585-2). According to Hunter, these facts and circumstances would lead a "reasonable, prudent and extensively trained law enforcement officer, to believe that illegal controlled substances are located, stored, or contained at or in 1001 Washington Avenue apt. 4, Cabell County, West Virginia." Id. ¶ 6. A magistrate authorized the search warrant. Search Warrant, Ex. B to Gov't Resp., at PageID.3298.
Rosario, Hunter, Butler, and at least two other officers executed the search warrant for Apartment 4 later that same day. 2/11/2019 Hr'g Tr. at 47-48, 95-96, 132. The officers seized two firearms and narcotics during the search. Id. at 49, 96, 133; see also Incident/Offense Report, Ex. C to Gov't Resp. (Dkt. 585-3). Rosario recalled reviewing photographs from the search warrant, in which a piece of luggage *529 with clothing in it was visible, but he could not recall if the clothing belonged to Jackson. 2/11/2019 Hr'g Tr. at 49. Butler similarly recalled a suitcase in the apartment, but he did not know its contents or to whom it belonged. Id. at 97.
Jackson now seeks to suppress the physical evidence seized during the pat-down of his person and subsequent search of Apartment 4.
II. DISCUSSION
Jackson argues that he was unconstitutionally seized because the knock-and-talk procedure employed in this case was not consensual and the officers lacked reasonable suspicion for the investigatory seizure. Jackson also argues that he has standing[4] to contest the subsequent search of Apartment 4, that the search warrant was not supported by probable cause, and that the good-faith exception does not apply. The Court addresses each argument in turn.
A. Constitutionality of the Seizure
The Fourth Amendment to the U.S. Constitution guarantees people the right "to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. For purposes of this amendment, a seizure of a person occurs when a law enforcement officer, "by means of physical force or show of authority, terminates or restrains [the person's] freedom of movement through means intentionally applied." Brendlin v. California, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) (citations and emphasis omitted); see also Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."). The test for determining if a seizure has occurred is generally whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Brendlin, 551 U.S. at 255, 127 S.Ct. 2400. But "when a person has no desire to leave for reasons unrelated to the police presence," id., or if the person's "freedom of movement [is] restricted by a factor independent of police conduct," Florida v. Bostick, 501 U.S. 429, 436, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), determining if the "coercive effect of the encounter" amounts to a seizure is measured by asking whether "a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter," Brendlin, 551 U.S. at 255, 127 S.Ct. 2400 ; accord United States v. Williams, 615 F.3d 657, 663 (6th Cir. 2010).
An encounter between a law enforcement officer and a citizen will typically fall within one of the following three categories, each of which has a corresponding standard for reasonableness. The first is a consensual encounter, which does not constitute a seizure and may be initiated by an officer without any objective *530 level of suspicion. United States v. Waldon, 206 F.3d 597, 602 (6th Cir. 2000). The second type of encounter is a nonconsensual investigative stop or detention, which amounts to a seizure and requires a reasonable, articulable suspicion of criminal activity. Id. Finally, an encounter may constitute a full-blown arrest, which is valid only if the seizure is supported by probable cause. Id. The constitutional protections of the Fourth Amendment extend to all seizures, including brief investigatory stops. United States v. Arvizu, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).
The encounter between Jackson, Rosario, and Butler concerns the line between the first two categories. In other words, did a purportedly consensual encounter become a seizure, thereby triggering the protections of the Fourth Amendment? Because Jackson's freedom of movement was restricted by a factor independent of police conduct-namely, his being inside of a confined apartment-the appropriate test to apply from Brendlin is whether, based on the totality of the circumstances, a reasonable person would believe that he or she was free to decline the officers' request or otherwise terminate the encounter. If Jackson was seized, the next issue this Court must decide is whether or not the officers had reasonable suspicion at that point.
1. The Knock-and-Talk Encounter Was Nonconsensual and Amounted to a Seizure
The Sixth Circuit has held that a police officer knocking on the front door of a home to speak with the occupant-colloquially referred to as a "knock and talk" procedure or technique-is generally permissible, provided it is consensual. Smith v. City of Wyoming, 821 F.3d 697, 713 (6th Cir. 2016).[5] Although a knock-and-talk is generally considered a consensual encounter, see United States v. Nappier, 155 F. App'x 859, 864 (6th Cir. 2005) ("The fact that an encounter is initiated by police officers at the individual's home does not create a 'seizure' in what otherwise would be a consensual contact."), when that encounter is no longer consensual, the officer lacks the authority to continue the interaction, see Smith, 821 F.3d at 713 ("[W]hether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or *531 to speak .... And even if an occupant chooses the open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any question at any time." (quoting Kentucky v. King, 563 U.S. 452, 469-470, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011) ) ); see also Bostick, 501 U.S. at 434, 111 S.Ct. 2382 ("So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required." (citations and quotation marks omitted) ).
A police officer's attempt to perform a knock-and-talk may become coercive and exceed the scope of a consensual encounter if the officer asserts his or her authority, refuses to leave, or otherwise makes "the people inside feel they cannot refuse to open up." United States v. Spotted Elk, 548 F.3d 641, 655 (8th Cir. 2008) ; Smith, 821 F.3d at 713 (citing Spotted Elk favorably); see also United States v. Thomas, 430 F.3d 274, 277 (6th Cir. 2005) (recognizing that "a consensual encounter at the doorstep may evolve into a 'constructive entry' when the police, while not entering the home, deploy overbearing tactics that essentially force the individual out of the home," and that "coercive police conduct" may include "a show of authority that the Defendant reasonably believed he had no choice but to comply"). Whether or not a knock-and-talk encounter is consensual for purposes of determining if a person was seized will often depend "on the show of force exhibited by the police," Thomas, 430 F.3d at 277, which may include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled," United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ; Williams, 615 F.3d at 663 (same).
Based on the totality of the circumstances, there is little doubt that Jackson and Jennings were seized when they answered the apartment door. This case is far from a consensual knock-and-talk encounter where officers politely knock once on the front door of the residence to speak with the occupant. E.g., United States v. Crapser, 472 F.3d 1141, 1145-1146 (9th Cir. 2007) (knock-and-talk encounter was consensual where there was a "single, polite knock on the door" of the motel room; the officers asked the occupant to open the door; they did not demand that she open the door or "affirmatively assert their authority"; they "waited patiently and silently" for her to come outside; and the entire encounter occurred in the middle of the day and lasted about five minutes (citing United States v. Cormier, 220 F.3d 1103 (9th Cir. 2000) ) ).
During their first attempt at a knock-and-talk, Rosario and Butler knocked repeatedly on the apartment door for two to three minutes, and they did so loud enough to wake a sleeping occupant. While they were knocking on the door, the officers also used a "tone of presence" to announce that they were police officers.[6] The officers were not wearing plain clothes; rather, each of them wore clothing that clearly designated that they were affiliated with the police. Nor were Rosario and Butler the only officers at the apartment complex. A person looking outside the window of *532 Apartment 4 would have seen ten to fifteen police officers, some of whom were members of the SWAT team and wore tactical gear and carried long guns, as well as a SWAT van. This type of significant police presence would have created an intimidating, nonconsensual encounter. See, e.g., United States v. Jerez, 108 F.3d 684, 692 (7th Cir. 1997) ("When a person is in a confined area, encircling the area in an intimidating fashion contributes to a reasonable belief that ignoring the law enforcement presence is not an option."); United States v. Al-Azzawy, 784 F.2d 890, 893 (9th Cir. 1985) (holding defendant was seized inside his home when officers surrounded his trailer and ordered him through a bullhorn to leave the trailer and drop to his knees). Nor was the loud knocking on the apartment door the only sound Jackson heard that morning. He testified that he also heard loud noises coming from other areas of the apartment complex, including the breaking of glass, see 2/11/2019 Hr'g Tr. at 139-140, 145, which is consistent with Rosario's description of officers breaking a glass sliding door to execute the search warrant for Apartment 8.
After Rosario and Butler did not receive an answer after knocking on the apartment door the first time, they should not have gone back to the apartment to attempt a second knock-and-talk. See United States v. Perea-Rey, 680 F.3d 1179, 1188 (9th Cir. 2012) ("[O]nce an attempt to initiate a consensual encounter with the occupants of a home fails, 'the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance.' " (quoting United States v. Troop, 514 F.3d 405, 410 (5th Cir. 2008) ) ). Even Rosario did not believe that anyone was going to come out of the apartment after the first knock-and-talk attempt. Nevertheless, Rosario and Butler waited about ten minutes before returning to Apartment 4 to again knock repeatedly and loudly, while also announcing their presence. As Butler acknowledged during the evidentiary hearing, this was not a "normal" knock-and-talk.
Rosario and Butler's return for a second knock-and-talk attempt confirms the conclusion that the sequence of events amounted to a seizure, as the detectives undoubtedly "convey[ed] a message that compliance with their requests [was] required." Bostick, 501 U.S. at 435, 111 S.Ct. 2382 ; see also Jerez, 108 F.3d at 692 ("The deputies' persistence, in the face of the refusal to admit, transformed what began as an attempt to engage in a consensual encounter into an investigatory stop." (citing United States v. Wilson, 953 F.2d 116 (4th Cir. 1991) ) ).
Based on the loud and persistent knocking of two to three minutes, occurring twice during the span of fifteen minutes, the use of an authoritative tone of voice when the officers announced their presence, and the significant police presence at the apartment complex, the Court concludes that any reasonable person inside the apartment would not feel free to refuse to open the door or otherwise terminate the encounter. See, e.g., United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008) ("A reasonable person faced with several police officers consistently knocking and yelling at their door for twenty minutes in the early morning hours would not feel free to ignore the officers' implicit command to open the door."); Cormier, 220 F.3d at 1109 (coercive circumstances that would transform a knock-and-talk into a seizure include police officers being unreasonably persistent in attempting to gain entry); United States v. Velazco-Durazo, 372 F.Supp.2d 520, 525-526 (D. Ariz. 2005) (holding that, "[u]nder the totality of the circumstances-the unreasonably loud and *533 persistent knocking, the announcement that the police wanted to talk with someone, and the nighttime setting-the conduct of the police would have communicated to a reasonable person that he was not free to decline the officers' requests or otherwise terminate the encounter," and, therefore, the defendant "was seized within the meaning of the Fourth Amendment"). This conduct strikes at the very core of the Fourth Amendment-namely, that a person has the right "to retreat into his [or her] own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961).
Therefore, at the moment Jackson and Jennings finally answered the door, they did so in response to the officers' show of authority. Because Jackson and Jennings were both seized at that point in time, and the seizure amounted to, at a minimum, an investigatory detention, the officers needed at least reasonable, articulable suspicion of criminal activity to justify the seizure. INS v. Delgado, 466 U.S. 210, 216-217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) ("[I]f the persons refuse to answer and the police take additional steps ... to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure."); Carr, 674 F.3d at 574 ("Once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a Terry stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth Amendment." (quoting United States v. Campbell, 486 F.3d 949, 954 (6th Cir. 2007) ) ).
2. The Seizure Was Not Supported by Reasonable Suspicion
At the initial point of seizure, the encounter was not a full-blown arrest. Instead, it was more akin to an investigatory detention under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An officer may briefly detain a person under Terry only if he or she "has reasonable, articulable suspicion" that the person seized "has been, is, or is about to be engaged in criminal activity." United States v. Place, 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ; Reid v. Georgia, 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) ; United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010). "The 'reasonable suspicion' necessary to justify [an investigatory] stop 'is dependent upon both the content of information possessed by police and its degree of reliability.' " Navarette v. California, 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014) (quoting Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) ). Because that suspicion must be "based on specific, objective facts," Brown v. Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the detaining officers must have a "particularized and objective basis for suspecting the particular person stopped of criminal activity," United States v. Cortez, 449 U.S. 411, 417-418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). An "inchoate and unparticularized suspicion or 'hunch' " will not suffice. Terry, 392 U.S. at 27, 88 S.Ct. 1868. In evaluating whether an officer had reasonable suspicion, the court must consider the totality of the circumstances at the time of seizure, as opposed to analyzing each fact in isolation. Arvizu, 534 U.S. at 273, 122 S.Ct. 744 ; United States v. McCauley, 548 F.3d 440, 443 (6th Cir. 2008).
The information the Huntington Police Department had when Jackson and Jennings were seized was that, based on a tip supposedly made by the apartment's landlord a week earlier, possible drug activity *534 had occurred at Apartment 4.[7] This vague and uncorroborated tip was insufficient to justify the seizure.
Where an informant's tip is the basis for an investigatory stop, as opposed to police observation, the tip must exhibit "sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Florida v. J.L., 529 U.S. 266, 270, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (quoting White, 496 U.S. at 327, 110 S.Ct. 2412 ); Bazzi v. City of Dearborn, 658 F.3d 598, 604 (6th Cir. 2011). An informant's veracity, reliability, and basis of knowledge are highly relevant in determining whether reasonable suspicion existed at the time of the seizure based on a totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ; White, 496 U.S. at 328-329, 110 S.Ct. 2412 (applying the totality-of-the-circumstances standard from Gates to determine if anonymous tip gave rise to reasonable suspicion). These three are not evaluated independently, however, as "more of one compensates for less of the others." United States v. Hines, 885 F.3d 919, 925 (6th Cir. 2018) ; see also United States v. Stokes, 742 F. App'x 947, 950 (6th Cir. 2018) (describing this exercise as a " 'sliding scale' that runs between less reliable tips (such as those [that] come from anonymous sources) and more reliable tips (such as those that come 'from known or reliable informants')").
"Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " J.L., 529 U.S. at 270, 120 S.Ct. 1375 (quoting White, 496 U.S. at 329, 110 S.Ct. 2412 ). Nevertheless, under certain circumstances, "an anonymous tip can demonstrate sufficient indicia of reliability to provide reasonable suspicion to make an investigatory stop." Navarette, 572 U.S. at 397, 134 S.Ct. 1683. For instance, when a tipster provides details about a suspect's future actions that police officers are then able to independently corroborate, the tip may be "sufficiently reliable to create reasonable suspicion of criminal activity." Id. at 398, 134 S.Ct. 1683 ("By accurately predicting future behavior, the tipster demonstrated a special familiarity with [the suspect's] affairs, which in turn implied that the tipster had access to reliable information about the individual's illegal activities."). However, if a police officer lacks a basis to believe the tipster had knowledge of supposed criminal activity, the tipster does not suggest he had any special familiarity with the suspect, and the tipster provides no predictions of future behavior that could be corroborated to assess the tipster's credibility, the tip is likely insufficient to justify a Terry stop. See, e.g., J.L., 529 U.S. at 271-272, 120 S.Ct. 1375 (reasonable *535 suspicion "requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person" (emphasis added) ).
Examples from the Supreme Court are instructive. In White, an anonymous phone tip to the police stated that a woman would drive from a particular apartment building at a particular time in a brown Plymouth station wagon with the right taillight lens broken, that she would be driving to a particular motel, and that she would be transporting cocaine. 496 U.S. at 327, 110 S.Ct. 2412. The Supreme Court held that the police officers' corroboration of the innocent details made the anonymous tip sufficiently reliable to create reasonable suspicion of criminal activity to justify the officers' investigatory stop of the vehicle as it neared the motel. Id. at 332, 110 S.Ct. 2412.
In J.L., by contrast, the Supreme Court held that a bare-bones tip from an unknown caller from an unknown location, stating merely that a young black male in a plaid shirt standing at a particular bus stop was armed with a gun, did not contain sufficient indicia of reliability to establish reasonable suspicion for an investigatory stop. 529 U.S. at 268, 271-272, 120 S.Ct. 1375. Significantly, the tip was from a completely anonymous caller who provided no predictive information whereby the police could test the informant's knowledge or credibility. Nor did the tipster explain how he knew about the gun. And an accurate description of the suspect's location and appearance was not enough because such a tip "does not show that the tipster ha[d] knowledge of concealed criminal activity." Id. at 272, 120 S.Ct. 1375. "Apart from the tip, the officers had no reason to suspect [J.L.] of illegal conduct." Id. at 268, 120 S.Ct. 1375.
In this case, the week-old tip was not reliable, detailed, or corroborated. Although the tip was not entirely anonymous, as the tipster claimed to be the landlord of the apartment complex, see United States v. Howard, 632 F. App'x 795, 799 (6th Cir. 2015) ("The statements of an informant whose identity is known to the police and who would be subject to prosecution for making a false report, are thus entitled to far greater weight than those of an anonymous source."), there nothing in the record to suggest that this information was ever corroborated by the police. This is especially true given that there are no facts to suggest the tipster provided his or her name and contact information, and Hunter, Rosario, and Butler could not recall who actually received the tip. Nor are there any no facts to suggest that the landlord was reliable because he or she had provided credible information in the past. Cf. United States v. Moore, 661 F.3d 309, 313 (6th Cir. 2011) (finding reliability where the confidential informant "had given information in the past that had led to two drug seizures"); United States v. Martin, 526 F.3d 926, 937 (6th Cir. 2008) (affidavit's statement "that the confidential informant in the present case is a known person who ... previously provided information that resulted in seizure of illegal controlled substances ... is sufficient to establish the informant's reliability"); United States v. Greene, 250 F.3d 471, 480 (6th Cir. 2001) ("Sixth Circuit precedent clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable.").
The tip was also extremely vague and did not explain the supposed landlord's basis of knowledge regarding "possible drug activity" at Apartment 4. The tipster did not provide any information about who rented the apartment, identify any determinate person involved in the drug activity, describe what type of drug activity was *536 occurring at the apartment or when it occurred, or suggest that he or she had first-hand observation of drug activity contemporaneous with the tip. Cf. Howard, 632 F. App'x at 802 ("In assessing an informant's 'basis of knowledge,' the degree of detail contained in a tip may be used to infer whether the informant had a reliable basis for making his statements."); Robinson v. Howes, 663 F.3d 819, 829 (6th Cir. 2011) ("Firsthand knowledge and contemporaneity weigh in favor of a statement's reliability"). The tipster did not explain how he or she knew about the drug activity or provide any predictions about future activity involving the apartment and drug activity. More importantly, unlike in White and J.L., the tipster provided no information that someone matching Jackson's description was ever involved in drug activity or predictions of Jackson's future actions. See Feathers v. Aey, 319 F.3d 843, 850 (6th Cir. 2003) (investigatory detention lacked reasonable suspicion where informant, among other things, "offered no future predictions or inside information that would suggest a special knowledge of [the suspect's] allegedly criminal activity").
Because the affidavit lacked any intrinsic indicia of the tipster's reliability, credibility, and basis of knowledge, independent police corroboration was required. However, the police officers did not independently corroborate any information provided in the tip to test the landlord's knowledge or credibility. E.g., 2/11/2019 Hr'g Tr. at 72 (Butler testified that he never performed any surveillance of Apartment 4 before June 8, and he never spoke with the landlord to see who lived in the apartment). This is not surprising, as there was very little information that could even be corroborated given the sparseness of the tip itself. Srisavath, 243 F. App'x at 917 ("Worse, as bare as this tip was, [the law enforcement officer] failed to corroborate what little information it did provide.").
Simply put, there were no specific, objective facts to suggest that either Jackson or Jennings had been, were, or were about to be engaged in criminal activity when they were seized. Therefore, based on the totality of the circumstances, the Court concludes that the officers lacked reasonable suspicion to justify the investigatory detention of Jackson and Jennings when they answered the door and exited the apartment.[8]
3. The Lack of Attenuation to Purge the Primary Taint
"[T]o deter law enforcement officials from violating the Fourth Amendment by stopping persons without reasonable suspicion or by arresting them without probable cause, the Supreme Court has directed that 'all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court regardless of its source.' " United States v. Pearce, 531 F.3d 374, 381 (6th Cir. 2008) (quoting Mapp v. Ohio, 367 U.S. 643, 654, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) ); see also *537 Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914) (establishing the exclusionary rule). "This exclusionary rule is supplemented by the 'fruit of the poisonous tree' doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." Pearce, 531 F.3d at 381 (citing Wong Sun v. United States, 371 U.S. 471, 484-485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) ). The Supreme Court has explained, however, that not all evidence must be suppressed "simply because it would not have come to light but for the illegal actions of the police." Wong Sun, 371 U.S. at 487-488, 83 S.Ct. 407. Rather, these doctrines will not apply when the connection between the unlawful detention and the evidence subsequently seized has "become so attenuated as to dissipate the taint." Id. at 491, 83 S.Ct. 407 (quoting Nardone v. United States, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939) ).
The test for attenuation is whether the evidence sought to be introduced "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 488, 83 S.Ct. 407 (internal quotation marks omitted); Hudson v. Michigan, 547 U.S. 586, 592, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006) (same). The Supreme Court has set forth three factors to guide this inquiry: (i) the "temporal proximity" of the unlawful detention]and the emergence of the incriminating evidence at issue, (ii) the existence of "intervening circumstances," and (iii) the "purpose and flagrancy of the official misconduct." Brown v. Illinois, 422 U.S. 590, 603-604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) ; accord United States v. Shaw, 464 F.3d 615, 625 (6th Cir. 2006) ("Dissipation of the taint resulting from an [illegality] ordinarily involves showing that there was some significant intervening time, space or event."). The Government bears the burden of persuasion to establish attenuation. Kaupp v. Texas, 538 U.S. 626, 633, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003) ; Shaw, 464 F.3d at 626 (citing Brown, 422 U.S. at 604, 95 S.Ct. 2254 ).
Here, the Government does not address whether any circumstances purged the primary taint of the unconstitutional seizure, and, therefore, it has failed to carry its burden of demonstrating attenuation. Nevertheless, based on the facts presented during the evidentiary hearing, the Court concludes that the officers did nothing to purge the primary taint of the illegal seizure in gaining the evidence they later obtained.
After Jackson exited the apartment, Rosario immediately directed him to the south side of the apartment complex and conducted a pat-down search, which led to the discovery on narcotics on Jackson's person. Although "there is no 'bright-line' test for temporal proximity," United States v. Wolfe, 166 F. App'x 228, 234 (6th Cir. 2006), this insignificant lapse of time between the initial seizure and discovery of narcotics evidence did not attenuate the taint of Rosario's unlawful conduct, see, e.g., United States v. Lopez-Arias, 344 F.3d 623, 630 (6th Cir. 2003) (thirty-minute lapse of time insufficient for attenuation); United States v. Richardson, 949 F.2d 851, 859 (6th Cir. 1991) (twenty-minute lapse of time insufficient for attenuation). Nor were there any intervening events that would "sever the causal connection between the illegal arrest and the discovery of the evidence," such as flight or the use of force. United States v. Beauchamp, 659 F.3d 560, 574 (6th Cir. 2011). The officers' conduct was also for the purpose of investigation, particularly given the prolonged and nonconsensual nature of the knock-and-talk, followed by a pat-down search that was not supported by reasonable suspicion.
*538 Williams, 615 F.3d at 670 ("[T]he purposefulness factor is met when the unlawful action is investigatory, that is, when officers unlawfully seize a defendant 'in the hope that something might turn up.' " (quoting Brown, 422 U.S. at 605, 95 S.Ct. 2254 ) ). In fact, Rosario testified that he would not have permitted Jackson to go back inside the apartment after exiting because Rosario wanted to "further investigate the information [the officers] had received." 2/11/2019 Hr'g Tr. at 54; see also id. at 16-17 (When asked whether it was his plan to conduct a pat-down search as soon as Jackson and Jennings had exited the apartment, Rosario answered, "Due to the circumstances, yes."). Butler also testified that he did not leave the vicinity of Apartment 4 because he "wanted to make sure that if there was somebody in there, we didn't want them to leave ... without talking to them, you know, at least trying to talk to them." Id. at 88. Finally, the manner in which the officers performed the knock-and-talk can most accurately be described as being calculated "to cause surprise, fright, and confusion." Brown, 422 U.S. at 605, 95 S.Ct. 2254. This type of misconduct "is precisely the type of conduct that Brown and its progeny seeks to deter." Beauchamp, 659 F.3d at 574 (quoting United States v. Baldwin, 114 F. App'x 675, 685 (6th Cir. 2004) ). Therefore, the narcotics found on Jackson's person must be suppressed.
Although there are no facts to suggest that Jackson consented to Rosario's pat-down search, Butler claimed during the evidentiary hearing that Jennings consented to a pat-down search outside of the apartment, which led to the discovery of narcotics and money. Assuming without deciding that Jennings voluntarily consented to that search, that evidence must also be suppressed if it was tainted by the illegality of the initial seizure. Florida v. Royer, 460 U.S. 491, 507-508, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (holding that, if consent to search is obtained after an illegal seizure, the consent is tainted by the illegality and does not justify the search); see also Beauchamp, 659 F.3d at 573 (same) (collecting Sixth Circuit cases). The taint of the unconstitutional seizure may be purged if the suspect's subsequent consent was the "product of an intervening act of free will." Beauchamp, 659 F.3d at 573. The factors for a court to consider in making this determination are similar for attenuation and include "the length of time between the illegal seizure and the consent; the presence of intervening circumstances; the purpose and flagrancy of the official misconduct; and whether the officers read the suspect his Miranda rights before he consented." Id. Again, the Government bears the burden of persuasion. Id. Although the Government did not carry its burden by failing to address this issue, the Court nevertheless concludes that none of the relevant factors, either individually or in aggregate, dissipates the primary taint of the unconstitutional seizure.
First, Jennings's consent was provided a matter of minutes (if not seconds) after the illegal seizure. Butler immediately separated Jennings from Jackson when the two exited the apartment, asked for consent without reading Jennings his Miranda rights, and then proceeded to perform the pat-down search after Jennings consented. "The absence of any intervening time between the seizure and the consent strongly suggests that the taint of the illegality did not dissipate." Beauchamp, 659 F.3d at 573-574 (citing Brown, 422 U.S. at 604, 95 S.Ct. 2254 ; Lopez-Arias, 344 F.3d at 630 ; Richardson, 949 F.2d at 859 ; United States v. Buchanan, 904 F.2d 349, 356 (6th Cir. 1990) ). Second, as with Jackson, there were no intervening circumstances that would "sever the causal *539 connection" between Jennings's illegal arrest and the discovery of the evidence. Id. at 574. Third, the officers' conduct was flagrant and for the purpose of investigation. Id. Because none of the factors suggest that Jennings's consent was due to an intervening act of free will, the evidence found on his person was obtained by exploiting the initial illegality; the taint of the unconstitutional seizure had not dissipated. This conclusion is relevant when the Court addresses Jackson's challenge to the subsequent search of the apartment because Hunter mentioned in his affidavit the narcotics found on Jennings to help establish probable cause for the search warrant.
B. Constitutionality of the Search
In addition to his argument that the initial seizure was unconstitutional and any evidence obtained following that seizure should be suppressed, Jackson contends that any evidence obtained during the execution of a search warrant later that day at Apartment 4 should also be suppressed. See generally Def. Br. at 11. Again, the Court agrees.
1. Jackson Was an Overnight Guest and had a Legitimate Expectation of Privacy in the Apartment
As the Supreme Court has repeatedly emphasized, the Fourth Amendment "protects people, not places." Katz v. United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967) ; see also Rakas v. Illinois, 439 U.S. 128, 134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."). Thus, a person contending that a search violated his or her Fourth Amendment rights must first demonstrate that he or she had a legitimate expectation of privacy in the premises searched that "society is prepared to recognize as reasonable." Carpenter v. United States, --- U.S. ----, 138 S.Ct. 2206, 2213, 201 L.Ed.2d 507 (2018) ; see also Kyllo v. United States, 533 U.S. 27, 33, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001) ("[A] Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable."); Katz, 389 U.S. at 361, 88 S.Ct. 507 (a person has a legitimate expectation of privacy if he exhibits an actual, subjective expectation of privacy that society is prepared to recognize as objectively reasonable) (Harlan, J., concurring); accord United States v. Mathis, 738 F.3d 719, 729 (6th Cir. 2013) ; United States v. Whitehead, 415 F.3d 583, 587 (6th Cir. 2005).
Although there is no "single metric or exhaustive list of considerations" to use when determining whether a person has a subjective and objectively reasonable expectation of privacy, Byrd v. United States, --- U.S. ----, 138 S.Ct. 1518, 1527, 200 L.Ed.2d 805 (2018), courts have often considered a variety of factors, including whether the person has (i) a "proprietary or possessory interest in the place to be searched or item to be seized"; (ii) "the right to exclude others from the place in question"; (iii) "taken normal precautions to maintain his privacy; and (iv) "exhibited a subjective expectation that the area would remain free from governmental intrusion," United States v. Allen, 720 F. App'x 254, 257 (6th Cir. 2018) (quoting United States v. Waller, 426 F.3d 838, 844 (6th Cir. 2005) ); see also United States v. Dillard, 438 F.3d 675, 682 (6th Cir. 2006). Although courts also consider whether the person was legitimately on the premises, Allen, 720 F. App'x at 257 ; Dillard, 438 F.3d at 682, this factor, by itself, "is not enough to accord a reasonable expectation of privacy," Byrd, 138 S.Ct. at 1527 (quoting *540 Rakas, 439 U.S. at 142, 99 S.Ct. 421 ). Nor is "a property right alone ... determinative of whether the individual reasonably expected 'freedom from governmental intrusion.' " United States v. King, 227 F.3d 732, 744 (6th Cir. 2000) (quoting Mancusi v. DeForte, 392 U.S. 364, 368, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) ).
Courts have routinely held that an overnight guest can claim a legitimate expectation of privacy in an authorized host's home. See, e.g., Minnesota v. Carter, 525 U.S. 83, 90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) ("[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not."); Minnesota v. Olson, 495 U.S. 91, 98, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (recognizing an overnight guest's "legitimate expectation of privacy in his host's home"); United States v. Vasquez, 706 F.Supp.2d 1015, 1023 (C.D. Cal. 2010) (recognizing that "an overnight guest is much more than someone who simply spends the night" because "[s]uch status is contingent upon an invitation by an authorized host" (citation, quotation marks, and emphasis omitted) ). For its part, the Sixth Circuit has "broadly interpreted the Fourth Amendment to protect nearly all overnight guests," whether they are "renters, couch surfers, or nomads." Allen, 720 F. App'x at 257 ; see also United States v. Washington, 573 F.3d 279, 283 (6th Cir. 2009) ("The Sixth Circuit has generously construed the Fourth Amendment as protecting nearly all overnight guests" and "has even extended standing to challenge a search to non-overnight guests who are permitted to keep items in the residence." (citing Waller, 426 F.3d at 844 ) ).
Here, Jackson seems to fit within the "couch surfer" or "nomad" variety of overnight guest. During the evidentiary hearing, Jackson testified that on June 7, 2015, he was with a couple of friends at the Cedar Point amusement park in Sandusky, Ohio. 2/11/2019 Hr'g Tr. at 137. Jennings was a part of the group and had driven Jackson to Cedar Point. Id. At some point during the day, Jennings and Jackson were invited to go to West Virginia "to just chill and have fun, party." Id. at 138. The two eventually ended up at Apartment 4 sometime later that night or early morning the next day. Id. Jackson thought that friends of Jennings occupied the apartment, and he was under the impression that Jennings had received permission to be in the apartment along with Jackson. Id. 138-139, 147. However, Jackson did not know the names of the people that supposedly owned or rented the apartment. Id. at 147. Although Jackson did not intend to stay the night at the apartment, he ended up falling asleep after smoking marijuana and drinking alcohol. Id. at 138.
Although Jackson may not be the typical overnight guest, given the Sixth Circuit's broad interpretation of the Fourth Amendment and the extension of its protections to "couch surfers" and "nomads," this Court finds these facts sufficient to establish that Jackson had a legitimate expectation of privacy in Apartment 4.
2. The Search Warrant Was Not Supported by Probable Cause
Because Jackson demonstrated that he had a legitimate expectation of privacy in Apartment 4, the Court must now determine whether there was probable cause to support the search warrant.
For a search warrant to be valid, it must be supported by probable cause. U.S. Const. amend. IV ("[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.").
*541 "Probable cause is defined as reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." United States v. Abernathy, 843 F.3d 243, 249 (6th Cir. 2016) (citations and quotation marks omitted).
To determine whether an affidavit establishes probable cause, an issuing magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238, 103 S.Ct. 2317 ; United States v. McCoy, 905 F.3d 409, 416 (6th Cir. 2018) (when reviewing a warrant application for indicia of probable cause, courts "read the affidavit reasonably ... holistically, examining the totality of the circumstances and employing a healthy dose of common sense"). Accordingly, the affidavit must demonstrate "a nexus between the place to be searched and the evidence sought." United States v. Laughton, 409 F.3d 744, 747-748 (6th Cir. 2005) (quoting United States v. Carpenter, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) ) (quotation marks omitted). "[W]hether an affidavit establishes a proper nexus is a fact-intensive question resolved by examining the totality of the circumstances presented." United States v. Brown, 828 F.3d 375, 382 (6th Cir. 2016).
In reviewing the magistrate's probable-cause determination, this Court's task is to ensure that the magistrate had a "substantial basis" for his conclusion. Gates, 462 U.S. at 238-239, 103 S.Ct. 2317. To encourage the use of and reliance on judicially approved warrants in the course of law enforcement investigations, "reviewing courts are to accord the magistrate's determination 'great deference,' " and a probable-cause determination "should only be reversed if it was arbitrarily exercised." United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2000) (en banc) (quoting Gates, 462 U.S. at 236, 103 S.Ct. 2317 ). The Court's review for sufficiency of evidence is limited to the information contained within the four corners of the affidavit. United States v. Coffee, 434 F.3d 887, 892 (6th Cir. 2006).
In this case, Hunter prepared the affidavit in support of a search warrant for Apartment 4, which relied on three principal pieces of information to establish probable cause: (i) the informant's tip, (ii) Morgan's association with drug dealers and prior relationship with either Jackson or Jennings, and (iii) the narcotics and money discovered on Jennings's person during Butler's pat-down search. See Hunter Aff. ¶¶ 5-6. Based on the totality of the circumstances, the Court concludes that the affidavit did not establish probable cause.
To begin, the evidence obtained during Butler's pat-down search of Jennings, which included narcotics and money, was tainted by the illegality of the initial seizure. See supra Section II.A.3. Generally, if a search warrant is tainted by an unlawful seizure, "the evidence obtained from the search warrant should also" be suppressed under the fruit-of-the-poisonous-tree doctrine. Richardson, 949 F.2d at 859. Derivative evidence may be admissible, however, "[i]f there was an independent basis supporting the search warrant" or "the discovery of the evidence was inevitable." Id. Accordingly, this Court must determine whether the remaining untainted information-the landlord's tip and Morgan's association with drug dealers and romantic relationship with either Jackson or Jennings-is sufficient to establish probable cause. See United States v. Karo, 468 U.S. 705, 719, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984) (holding that "if sufficient *542 untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid"); see also United States v. Bah, 794 F.3d 617, 634 (6th Cir. 2015) ("[I]n determining whether to apply the exclusionary rule, courts remove the illegally obtained fact from the affidavit and consider whether there is still sufficient information to establish probable cause for the search."); United States v. Wright, 131 F. App'x 471, 477 (6th Cir. 2005) ("[W]here a warrant affidavit contains both tainted and untainted information, a court must consider 'the sufficiency of the untainted affidavit to see if probable cause exists without the tainted information.' " (quoting United States v. Jenkins, 396 F.3d 751, 760 (6th Cir. 2005) ) ).
Here, the landlord's tip was unreliable, uncorroborated, and failed to support a finding of reasonable suspicion for the initial unconstitutional seizure. See supra Section II.A.2. Consequently, the tip also fails to satisfy the more demanding standard of probable cause. See White, 496 U.S. at 330, 110 S.Ct. 2412 ("Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.").
Regarding Morgan's association with drug dealers and her past romantic relationship with either Jackson or Jennings, the Court finds that this information in the affidavit also does not establish probable cause to search the apartment. Insofar as an inference can be drawn that either Jackson or Jennings was a drug dealer simply because Morgan associates with drug dealers, e.g. United States v. Stearn, 597 F.3d 540, 566 (3d Cir. 2010) ("Stearn's conspicuous association with Joseph Doebley, a known drug dealer, supports the inference that Stearn was involved in the drug trade."), the Sixth Circuit has repeatedly held that a defendant's status as a drug dealer, standing alone, "is insufficient to tie the alleged criminal activity to the defendant's residence." McCoy, 905 F.3d at 416-417 ; United States v. Jenkins, 743 F. App'x 636, 642 (6th Cir. 2018) (same). Instead, for an affidavit to establish probable cause, it "must include some facts connecting the residence to drug-dealing activity beyond just the defendant's status as a drug dealer." Jenkins, 743 F. App'x at 642 (citing Brown, 828 F.3d at 382-384 ); see also McCoy, 905 F.3d at 417 (holding that "[t]he affidavit ... must establish some other reason to believe that drugs or other evidence of crime [will] be found in the suspect's residence." (quoting Peffer v. Stephens, 880 F.3d 256, 273 (6th Cir. 2018) ) ). Again, the only untainted facts in the affidavit that arguably connected the apartment to criminal activity was the supposed landlord's vague week-old tip about "possible drug activity," which was unreliable and uncorroborated. More importantly, that tip did not connect the apartment to any purported drug-dealing activity involving Jackson or Jennings in particular.
Therefore, based on the totality of the circumstances, this Court concludes that the search warrant was not supported by probable cause.
3. The Good-Faith Exception Does Not Apply and a Franks Hearing is Not Warranted
Although the judicially developed exclusionary rule generally prevents the Government from using evidence obtained in violation of the Fourth Amendment against a victim of an unlawful search, a magistrate's error in issuing a search warrant *543 does not necessarily require suppression of evidence. McCoy, 905 F.3d at 415 ; Carpenter, 360 F.3d at 595 (same). In United States v. Leon, the Supreme Court created an exception to the exclusionary rule for evidence "seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." 468 U.S. 897, 905, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).
To determine whether the good-faith exception applies, a court must decide "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." Id. at 923 n.23, 104 S.Ct. 3405. The Supreme Court has identified four situations in which an officer's reliance would not be objectively reasonable: (i) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit" that violated Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ; (ii) "where the issuing magistrate wholly abandoned his judicial role;" (iii) when the warrant is "based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;' " and (iv) when a warrant is "so facially deficient-i.e., in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923, 104 S.Ct. 3405 (quoting Brown v. Illinois, 422 U.S. 590, 610-611, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975) (Powell, J., concurring) ); Abernathy, 843 F.3d at 257 (same).
Under the circumstances of this case, however, the question is whether the good-faith exception should apply when officers act pursuant to a search warrant that was based on an unconstitutional predicate search. United States v. Fugate, 499 F. App'x 514, 518 (6th Cir. 2012). To answer that question, this Court is guided by the Sixth Circuit's decision in United States v. McClain, 444 F.3d 556 (6th Cir. 2005). To decide whether an "objectively reasonable officer could believe in the validity of a subsequent search warrant secured, in part, on the basis of evidence seized during [an] earlier search," this Court must consider (i) whether "the officers who sought and executed the search warrant[ ] acted in good faith as prescribed by Leon," and (ii) whether "the facts surrounding the initial ... search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrant[ ] objectively reasonable." United States v. Tucker, 742 F. App'x 994, 1003 (6th Cir. 2018) (quoting McClain, 444 F.3d at 566 ). This Court must consider the actions of all the officers involved to determine whether the good-faith exception applies. Fugate, 499 F. App'x at 519.
As discussed at length above, the circumstances surrounding Rosario and Butler's knock-and-talk encounter fell far from the line of validity, as both officers were objectively unreasonable in believing that any criminal activity was occurring inside the apartment. Moreover, unlike in McClain, 444 F.3d at 566, where the officers who sought and executed the search warrants were not the same officers who performed the initial unlawful search, both Rosario and Butler participated in the execution of the search warrant at Apartment 4. And Hunter, who was present at the scene during the knock-and-talk encounter, prepared the affidavit in support of the search warrant and participated in the execution of the search warrant. The glaring unconstitutionality of the nonconsensual seizure would have been known to an objectively reasonable officer, including an officer at the scene who subsequently sought and executed the search warrant, which was based largely in part on evidence *544 discovered after the initial seizure. This is precisely the type of police misconduct the exclusionary rule is meant to deter, and that deterrence is surely "worth the price paid by the justice system." Herring v. United States, 555 U.S. 135, 144, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009). Therefore, the Court concludes that suppressing the derivative evidence discovered in Apartment 4 during the execution of the search warrant serves the essential purpose of the exclusionary rule-to deter future law enforcement officers from violating the Fourth Amendment. Davis v. United States, 564 U.S. 229, 236-237, 131 S.Ct. 2419, 180 L.Ed.2d 285 (2011).
Finally, Jackson requests an evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), to challenge the validity of the search warrant based on the contents of the underlying affidavit. See Def. Br. at 12. A defendant is entitled to a Franks hearing if he or she: (i) makes a substantial preliminary showing that the affiant knowingly and intentionally, or with reckless disregard for the truth, included a false statement or material omission in the affidavit; and (ii) proves that the false statement or material omission is necessary to the probable cause finding in the affidavit. United States v. Young, 847 F.3d 328, 348-349 (6th Cir. 2017). Whether to hold such a hearing is committed to the sound discretion of the district court. Id. at 348. Because the Court concludes that the good-faith exception does not apply for other reasons, there is no longer a need to determine whether a Franks violation occurred in this case. Therefore, the Court denies this portion of Jackson's motion as moot.
III. CONCLUSION
For the reasons stated above, Jackson's motion to suppress evidence (Dkt. 543) is granted in part and denied in part. All physical evidence seized during the pat-down and subsequent search of the apartment is suppressed. Jackson's request for a Franks hearing is denied as moot.
SO ORDERED.

The scope of the evidentiary hearing was limited to the events surrounding the officers' arrival at the apartment and Jackson's subsequent arrest following a pat-down search, as well as any facts bearing on whether Jackson had a legitimate expectation of privacy in the apartment. See 12/6/2018 Order at 1 (Dkt. 624).

The "Chedda Grove" part of the enterprise's name is partially derived from one of the main streets in this territory-Cedargrove Street. 2d Superseding Indictment at 2.

These six defendants include Mario Jackson, Michael Richardson, Corey Mills, Devontae Russell, Phillip Peaks, and Patrick Johnson.

Despite the pervasive use of the term "standing" in opinions, it should be noted that the Supreme Court has rejected the concept of standing in the context of the Fourth Amendment. See Rakas v. Illinois, 439 U.S. 128, 139-140, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Rather, "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.' " Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (quoting Rakas, 439 U.S. at 140, 99 S.Ct. 421 ); accord United States v. Britton, 335 F. App'x 571, 574 (6th Cir. 2009) ; United States v. Smith, 263 F.3d 571, 581-582 (6th Cir. 2001) ; United States v. King, 227 F.3d 732, 743 n.1 (6th Cir. 2000).

Although the Sixth Circuit has recognized that knock-and-talk encounters are a "legitimate investigative technique at the home of a suspect or an individual with information about an investigation," United States v. Thomas, 430 F.3d 274, 277 (6th Cir. 2005) (collecting cases), this type of investigative technique is easily subject to abuse and has received its fair share of criticism, see, e.g., Lawson v. Hilderbrand, 88 F.Supp.3d 84, 88 (D. Conn. 2015) (explaining why knock-and-talk encounters may be "ripe for manipulation and abuse"), rev'd on other grounds, 642 F. App'x 34 (2d Cir. 2016) ; United States v. Boyd, 910 F.Supp.2d 995, 1003 (W.D. Mich. 2011) (noting that the knock-and-talk "investigation technique is subject to abuse by law enforcement, as an officer's zeal to gain information can prey on citizens' belief in the honesty of the police") (collecting cases); see also Quiwana N. Chaney, United States v. Carloss: An Unclear and Dangerous Threat to Fourth Amendment Protections of the Home and Curtilage, 95 Denv. L. Rev. 519 (2018) ; Andrew Eppich, Wolf at the Door: Issues of Place and Race in the Use of the "Knock and Talk" Policing Technique, 32 B.C. J.L. & Soc. Just. 119 (2012) ; Craig M. Bradley, "Knock and Talk" and the Fourth Amendment, 84 Ind. L.J. 1099 (2009) ; Marc L. Waite, Reining in "Knock and Talk" Investigations: Using Missouri v. Seibert to Curtail an End-Run Around the Fourth Amendment, 41 Val. U. L. Rev. 1335 (2007). This case illustrates why the concerns about the improper use and execution of knock-and-talk encounters are justified.

Although an encounter does not become compulsory merely because a person identifies himself or herself as a police officer, see United States v. Carr, 674 F.3d 570, 573 (6th Cir. 2012), the manner of knocking and tone of voice used here sets it apart from a consensual encounter.

Rosario's testimony concerning when he learned about this drug complaint was equivocal. Although he testified that he knew about the drug complaint involving Apartment 4 before conducting the knock-and-talk, 2/11/2019 Hr'g Tr. at 30, Rosario also testified that he did not recall if he learned about the drug complaint before the events of June 8, and he did not recall speaking to Hunter about the complaint, id. at 29-30. Butler's testimony is not much better. At one point, he stated that he did not know about the tip or its subject matter. Id. at 72. However, Butler later testified that, leading up to the knock-and-talk, he had learned about a complaint about drug activity involving Apartment 4 that previously came in from either the landlord or someone involved with managing the apartment building. Id. at 87. Nevertheless, for purposes of determining whether the Terry stop in this case was reasonable, this Court imputes to Rosario and Butler the knowledge about the tip and its contents received by other Huntington Police Department officers. See Srisavath v. City of Brentwood, 243 F. App'x 909, 916 (6th Cir. 2007).

Aside from the fact that Rosario and Butler did not have reasonable suspicion when Jackson and Jennings were initially seized, the Court finds that Rosario lacked reasonable suspicion to perform the pat-down search of Jackson for purposes of officer safety. It is true that an officer may be justified in performing a pat-down search of an individual whom the officer has reasonable suspicion to believe is a drug dealer. See United States v. Branch, 537 F.3d 582, 589 (6th Cir. 2008) (an officer is "entitled to rely on his training and experience that drug dealers frequently carry weapons" to justify a pat-down search of a suspected drug dealer). However, Rosario never stated that he suspected Jackson of being a drug dealer or had other reason to believe that Jackson was armed. Therefore, Rosario also lacked reasonable suspicion to perform the pat-down search for officer safety when Jackson was outside the apartment.